*In re* WARD *et al.*

*In re* ROBINSON.

(*Supreme Court, Special Term, St. Lawrence County.* November 7, 1892.)

1. ELECTIONS AND VOTERS—STRIKING NAMES FROM VOTING LIST—POWER OF JUDGE.

Laws 1892, c. 680, § 35, provides that if one applying to a board of inspectors for registry for an election to have his name placed on the list of voters, being challenged, makes oath to facts qualifying him to vote in such district, his name shall be put on the list; otherwise not. Section 37 provides that if the board shall, on sufficient evidence, refuse to strike from the list any person not qualified to vote, or shall refuse to put on the list the name of any person entitled thereto, application may be made to any one of certain justices or judges, and such justice or judge may, on sufficient evidence, and on such notice, of not less than 24 hours, to the board of inspectors and other persons interested, of such application, as the justice or judge may require, order such name to be stricken from or added to the list, as the case may be. *Held,* that in such summary proceeding the justice or judge could strike from or add to the list a name only for reasons on account of which the inspectors, who have merely ministerial powers, could have done the same thing, and that, where one complied with all the statutory requirements entitling him to registration, such statute did not give any judicial officer power to strike his name from the list.

2. SAME—RESIDENCE—STUDENTS.

Under Const. art. 2, § 3, providing that "for the purpose of voting no person shall be deemed to have gained or lost a residence by reason of his presence or absence * * * while a student at a seminary of learning," where one on going to college abandons his previous home, he is not debarred from gaining a residence at the place of the college during the time he is a student there.[1]

3. SAME—APPEALABLE ORDER.

An order of a justice directing the name of a person to be stricken from the list of voters on application, under section 37, on the ground that he was not a resident of the place, is appealable.

4. SAME—STAY OF PROCEEDINGS.

So, too, such proceedings may be stayed pending appeal from the order.

5. SAME.

The right to appeal or to a stay cannot be affected by failure of the person applying to have the name stricken to file his papers or enter an order.

6. SAME—DISQUALIFICATION—RECEIVING AID FROM COLLEGE.

The fact that a student, for the purpose of pursuing his studies, applies for and obtains aid in the nature of a loan from his college in no way makes him a public applicant for aid.

Nelson L. Robinson applied to have the names of Lyman C. Ward and three others, students of St. Lawrence University, stricken from the voting lists, under the provisions of Laws 1892, c. 680, § 37. An order in favor of applicant was made, but pending appeal the proceedings were stayed. The students now apply for an order to show cause why the stay should not be continued. Stay continued.

*Everett Caldwell,* for the voters. *Ledyard P. Hale,* for the Board of Registry. *Nelson L. Robinson, in pro. per.,* as applicant for the erasure of the names.

---

[1] In Shaeffer v. Gilbert, 20 Atl. Rep. 434, 73 Md. 66, it appeared that Gilbert, after reaching 21 years of age, went from his home, in Harford county, Md., to Baltimore, and entered Morgan College, where he lived for 7 years, except during vacations, when he was employed as a waiter at various summer resorts. During this time he supported himself by his own efforts, and once a year visited his mother at his old home in Harford county, remaining each time two or three days. Several years after entering college he procured a transfer of his registration as a voter from Harford county to Baltimore, and has voted there ever since. On this state of facts it was held that Gilbert was a "resident" at the college, and was entitled to registration in the precinct in which it was situated, under Const. Md. art 1, § 1, which declares that "every male citizen of the United States of the age of twenty-one years or upwards, who has been a resident of the state for one year, and of the legislative district of Baltimore city, or of the county in which he may offer to vote, for six months next preceding the election, shall be entitled to vote in the ward or election district in which he resides."

RUSSELL, J. On the last registration day the above-named persons appeared personally for registry in the first election district of the town of Canton, and objection was made to their registry by Nelson L. Robinson, a voter of said election district. The applicants took the preliminary oath, and answered questions touching their residence, that being the only objection made against their qualification as voters. It was conceded that they were all voters somewhere, but the objection was to their being registered in that particular election district. The applicants insisted on being registered at Canton, as they had lost their previous residences before coming to Canton, having abandoned their former homes, and, if they are not entitled to vote at Canton, they occupy the singular position of qualified voters whose right of suffrage is indefinitely suspended. They took the general oath, and were registered. The objector, Mr. Robinson, obtained an order to show cause why their names should not be stricken from the registry, from a justice of the supreme court in a distant part of the state, on 24 hours' notice, thus giving them a very short time in which to employ counsel, draft papers in opposition, secure witnesses from their former homes as to their departure from those places with the intent to leave permanently, and appear by counsel at the place of hearing in time to prevent a default. Hasty preparation was made to oppose the motion, and counsel appeared in opposition, contesting the allegation of nonresidence made by Robinson, upon the merits, but the opposition was unavailing, as the justice before whom the motion was held granted the order at the conclusion of the hearing, no opinion being presented here as having been given by the justice deciding the motion. An application was at once made to the special term of this court to grant a stay of proceedings, in order that the persons claiming the right to vote might enjoy their privilege of appeal, which would be worthless without a stay. Such a stay was granted, and an order to show cause made why the stay should not be continued, returnable on this 7th of November at 2 o'clock in the afternoon. This application for a continuance of the stay is the occasion for the consideration of the legal questions embraced in this opinion.

The remedy heretofore for illegal registry, or refusal to register by inspectors, has been an application for *mandamus*, on which application the rights of the parties might be fairly and judicially determined. If upon the facts presented the applicant was or was not a voter, the question could be easily determined as a question of law, and the writ of *mandamus* awarded according to the conclusion. If, however, a serious question of fact arose upon the hearing, the courts would never assume to pass summarily upon the sacred right of suffrage, but compelled the issue to be tried by common-law proceedings before a jury, in which way alone the franchise, more valuable to the citizen than a property right, could be properly awarded or denied. But it is claimed that the new election law, (chapter 680, Laws 1892,) gives by the thirty-seventh section a more summary and arbitrary method of awarding or denying the elective franchise to a citizen. That section in its literal reading provides that application may be made to a county judge of the county, a justice of the supreme court of the judicial district, or a justice of the supreme court residing in a county adjoining the judicial district, to have a name erased from or added to the registry, and the justice or judge may, upon sufficient evidence and a notice of not less than 24 hours to the board of inspectors and the persons interested, strike from or add to the registry, as the case might be. If this section may be properly construed to give any single judge the right to prevent any single person, or any number of persons, from voting by striking their names from the registry, as under the existing law all names of voters must be registered 10 days prior to election, without the right of a common-law trial of the issue of qualification or residence, without the right of review before the court either on motion to modify or vacate, or by appeal, then the provision is of a sweeping and revolutionary character, and danger-

ous in the extreme. Under such power the presidential election of 1884 could have been determined otherwise than as it was determined by any one judge exercising the power of striking 600 names from the registry list in the state of New York. Under such an exercise of power the judges of the state, acting as judicial officers and not as courts, will hold the elections of the state at their mercy. Such a power, so construed, would be unconstitutional as to its exercise, would deny the right of suffrage granted by the constitution of the state, and would leave the election of those electors who choose the president and vice president of the United States, and of members of the house of representatives of the United States, entirely within the power of state judicial officers. I cannot believe that the legislature of this state intended to confer any such arbitrary power, which might be exercised up to within 24 hours of election. I think the plain meaning of the section, in view of the sacred rights with which it undertakes to deal, the errors which it undertakes to point out the way to correct, and the necessary consequence of the exercise of the power sought to be given, is intended for far more limited exercise of judicial discretion and privilege than the one so broadly claimed. If the inspectors register persons refusing to take the oath required by law, or refusing to present themselves in person on the days required for personal registration, or who fail to comply with other steps which the law requires, and which the inspectors as ministerial officers plainly see have not been taken; or if they refuse to register persons complying with the laws, or in any way undertake to exercise a judicial power which is not conferred upon inspectors of election,—then the privilege conferred upon judicial officers to correct these errors by a special proceeding of a summary character may be wisely conferred. For the power given to the judicial officers to correct the registration is in the nature of a revision of the ministerial action of the inspectors, and not of any judicial action. The inspectors of elections have no judicial power to determine contested questions of fact as to residence or any other matter which involves judicial discretion. *People* v. *Bell*, 119 N. Y. 175, 23 N. E. Rep. 533.

A judicial officer, who has power to revise a ministerial action of a board of inspectors, does not by the statute in question gain a power to do a thing which the board of inspectors might not do, for their power is statutory, and is limited to the correction of an error which would not have taken place but for the invalid action of the board of inspectors. The statute did not seek to give other power, but expressly provides that the power of the judicial officer may be exercised only if the board refuse to strike from the list the name of the person not so qualified to vote, or neglect or refuse to place upon the list the name of a person entitled to register. The logical conclusion therefore inevitably follows that a judge may not by such a statutory power strike a name from the list which the inspectors of election could not strike from the registry. In the case last cited the court of appeals unanimously determine not only that inspectors of election are ministerial officers simply and purely, but that a board of inspectors has no discretional power to reject the vote of a person who, when challenged, takes the preliminary and general oaths, no matter what the private opinion of the inspectors may be as to his being really a voter upon the facts stated by him in answer to the various questions. And the opinion of the court, which seems to have been received without dissent, states that an elector's right cannot be annulled without a trial, and a trial certainly means a trial in a common-law proceeding, and not a summary hearing upon affidavits. This view is confirmed by the act of 1892, which seems to have followed and approved the decision of the court of appeals. By section 35 the applicant for registry may be required to take the oath which is to be administered to challenged persons offering to vote at a general election, and the only power of inspectors to deny the right of registry is expressly laid down to be, "if he shall refuse to make either such oath or state-

ment, his name shall not be placed on the said list." By section 110 of the act the power of the board of inspectors to reject where the preliminary general oaths are required, is limited to the express provision, "if any person shall refuse to take either oath so tendered, his vote shall be rejected." It will not be claimed, probably, that inspectors may reject, on the application for registry, a person whose vote they would be required to take at the election if registered. The registry law provides for ascertaining the names of persons entitled to vote at the election, and is a proceeding previously had to determine the *status* of an applicant on election day. The whole object of the provision to secure the right of a person to vote who takes the preliminary and general oath, and to deprive the inspectors of the power to exclude his vote, would be frustrated if the inspectors had a power, judicial in its character, at the registry, which they would not have at the election; for under it, as all applicants are required to register, the inspectors could exclude whom they chose from voting by denying the right of registry. The object of giving to the person taking the preliminary and general oaths the right to vote is plain. Judicial power is too serious to be intrusted to inspectors of election, and mistakes in the exercise of the right of voting may be corrected by the courts where the vote is taken, but can never be when it is refused. If the four persons applying at Canton to be registered as voters, or any number of persons there or elsewhere, secure illegal registration and vote, and such illegal votes determine the election of any person to office, the error can be promptly corrected by proper proceedings diminishing the number of votes counted for the person for whom they voted, in the ordinary and proper judicial course. But if the persons are erroneously denied the right of registration or of voting, the injury is irreparable. I therefore conclude that the power of the judge to correct the alleged error in the matter of registration was limited, and that he had not the right to deprive the four persons named of the elective franchise by a summary proceeding in a case where they had complied with all the statutory requirements to entitle them to registration, so that, independently of the merits of the question of their residences, no power under the statute in question was given to any judicial officer to strike their names from the list.

*Secondly.* I am also of the opinion that the decision arrived at was incorrect upon the merits of the question as to whether the persons named were qualified to vote in the first election district of the town of Canton. As before stated, it seems to be conceded that these persons are qualified voters somewhere. They state that they had abandoned their previous homes, and there does not appear to be any serious conflict of evidence upon this question. Whatever might be their purpose in leaving their former homes, when they had done so with the intention of never returning, their residences there ended. Their right to vote in the town of Canton is challenged under the provision of the constitution of the state of New York, which provides, "for the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence * * * while a student at any seminary of learning." Section 3, art. 2, Const. N. Y. One of the persons named is a married man, keeping house in Canton; one of them has an insurance business aside from his studying at the St. Lawrence University; and one of them occupies such time as he can in the avocation of a printer. A strict reading of the constitutional provision would allow these young men, who each came to Canton at a time when the sessions of the collegiate and theological departments had not begun, to claim it as a beneficial provision instead of a prohibition. And, if it be true that, coming to Canton in the summer, when the schools were not in session, their residence at Canton began while they were not actually in or present at a seminary of learning, then the provision also gives to them the right to claim that their presence at that seminary of learning afterwards does not interrupt the resident

period.   No person shall be deemed to have lost a residence while at a seminary of learning.   The applicant, Robinson, gives a still more strict construction to the constitutional provision.   He argues as though the provision read: "Every person who is a student at a seminary of learning is forbidden to vote at the place where the seminary of learning is located."   The counsel for the four persons named give a broader construction.   They say that the design of the section was to prevent a mass of students from claiming a residence for the purpose of voting, and thus be enabled to carry local elections by their num- bers in some localities, and that there was no design to inflict a punishment upon a person who chose to make any place his home, if at the same time he de- sired to avail himself of the unusual or special privileges of learning by the presence of a seminary of learning in the same town.   If young men come from their fathers' or mothers' homes, or from the homes of their relatives or friends, and so have other places to which they return in vacation or at the end of the collegiate term, they do not gain a residence.   This class em- braces the large majority of students, and this fact is illustrated by the num- bers applying in Canton, out of the many attending St. Lawrence Univer- sity, who would otherwise be qualified to vote.   Only five make application for registry.   They are special cases.   These gentlemen have no other homes. It is not essential to their right to vote that at the time they came to Canton they had determined to make that place their home for the remainder of their lives.   It is sufficient if, leaving and abandoning their former residence, they come to Canton to make that town their residence, leaving to the future to determine whether they shall, as many others have done similarly situated, enter the profession of the law or ministry or medicine, or some other busi- ness avocation, in that town at the end of their college careers.   The consti- tutions of 1777 and 1821 contained no such inhibition.   The constitution of 1846 was the first to embrace it within its provision.   A practical construc- tion was given to that provision of the constitution of 1846, during the 21 years which elapsed before another constitutional convention was held in the state of New York.   At the constitutional convention of 1867 the mean- ing of this phrase was carefully considered, and great light is thrown upon its intent by nonpartisan and well-measured utterances of gentlemen of different political parties in that convention.   The committee on suffrage eliminated the clause in question in its report of the suffrage article.   Mr. Chesebro, Democratic delegate at large, moved its insertion when the report of the committee came into the convention.   Judge Andrews, now of the court of appeals, and the present nominee for chief judge, in the remarks he made, stated: "If a student had no other residence than where he is attending col- lege, and if the intention was with him to remain in that place, although he might be a student there, he would have a right notwithstanding the inser- tion of this clause to vote there.   *Mr. Merrill.* Does the gentleman under- stand that, by the provision of the present constitution, a man may gain a residence by being a student in college?   *Mr. Andrews.* Oh, unquestion- ably."   Debates Const. Conv. p. 569.   The matter came up at a later date on a motion to strike out the clause from the constitution.   Mr. Cheseboro, who had it inserted, spoke as follows:   "The gentleman is mistaken.   A student can lose his residence while a student in a seminary of learning if he desires to, and can acquire a residence at the place where he is studying." The late Justice Rumsey, of the supreme court, also said: "He may, if he actually has the intention to change his residence, become a resident of the place where he is studying as fully as if he went to any other place, and in that case he acquires the right to vote."   The convention accepted the views of these gentlemen, and retained that provision in the constitution with the construction stated by them.   It would seem that this is the sensible and proper way to regard this constitutional provision, and any other interpre- tation would give to a person who has no desire to learn how to read and

write, and who moves from place to place, the right to acquire a residence for voting, and debar the student, ambitious to perfect his knowledge upon all subjects within the mental grasp, from the right to vote on questions of political importance which he appreciates keenly, and which he is training his mind to understand more fully. I have given the subjects embraced in this opinion careful thought and consideration, and have expressed them at such length, for the reason that I would hesitate naturally to differ with so able and learned a lawyer and judge as the gentleman who decided that these names should be stricken from the registry, unless fully convinced that his conclusion was erroneous.

The power to appeal from the order made by Justice HERRICK is undoubted. It is a proceeding before a judge invoking the exercise of judicial power and judgment, and affects the highest form of substantial right. Code Civil Proc. §§ 3334, 1356. I am advised that Justice HERRICK suggested the propriety of an appeal.

The power of the court to stay proceedings is equally clear. By the filing of the application the applicant commenced a judicial proceeding, the record of and the proceedings in which are under the jurisdiction, power, and control of the supreme court. It is the first duty of that court, upon proper application made to it, to see that injustice and the deprivation of legal rights are not consummated under the form of judicial proceedings in that court. The supreme court has general power to stay proceedings where the rights of justice require. *Jefferies* v. *Sheppard*, 3 Barn. & Ald. 696; *Mallory* v. *Insurance Co.*, 7 Hill, 192; *President, etc.*, v. *Spencer*, 15 How. Pr. 14, (Gen. Term, 7th Dist.;) *Navigation Co.* v. *Weed*, 8 How. Pr. 49, (HARRIS, J.) If power to stay exists, it should certainly be exercised, in order that the voters may have the right to present their cases on appeal. The right to appeal or to the stay cannot be prevented by a failure of the person who applies to have their names stricken from the registry to file his papers or enter an order. Such a limit upon the power to stay would deprive one in many cases of the right of appeal until after the party desiring to appeal had been irreparably injured. Therefore, in the view taken by myself, the four persons desiring to vote are entitled to a stay of the proceedings to give them the right to obtain a reversal of an order which destroys the right of suffrage to them.

I have not considered as affecting the merits of this question the allegations of Robinson and Atwood as to the pecuniary assistance afforded by the university out of its own funds, or as agent for another body. I do not regard those allegations as pertinent, or as properly finding any place whatever in the affidavits presented for the purpose of striking their names from the list. They could not be pertinent to the question of their being students at the university, for there was no conflict whatever upon that branch; they could not be pertinent on the question of their actual residence, for it was irrelevant whether they resided in Canton or not, as to the question of their pecuniary aid. The only other purpose of their insertion into the affidavits, which were voluntarily made by Robinson and Atwood, and which of course become public property, is to bring the persons under the charge of thus requiring pecuniary aid to live and pursue their avocations. I fail to see how they can be characterized in any manner as paupers. They are not kept at any public asylum. One or two of them deny in explicit terms that they have applied for any aid. The aid sought is simply in the nature of a loan, and their borrowing money of the university is no more derogatory to their condition or *status* than if they borrowed of any other person; and their application for aid by way of a loan is by the rules of the university a matter which should not be disclosed, so that in no sense are they public applicants for aid. The order to stay pending the appeal taken from the order of Justice HERRICK will be continued.