(Hamilton County Common Pleas.)

STATE OF OHIO ex rel. JACOB H. KAPLAN v. OSCAR W. KUHN, et al., constituting the Board of Directors of the University of Cincinnati.

STATE OF OHIO ex rel. JULIUS J. GUSFIELD v. OSCAR W. KUHN, et al., constituting the Board of Directors of the University of Cincinnati.

(1). Generally speaking, in the United States, citizenship may be said to depend upon domicil.

(2). Every person must have a domicil somewhere. No person can have more than one domicil at the same time. Every person who is sui juris and capable of controlling his personal movements may change his domicil at pleasure. A change of domicil is a question of fact and intention.

(3). The abandonment or change of domicil is a proceeding of a very serious nature, and an intention to make such a change requires to be proved by very satisfactory evidence.

(4). The fact that a party has voted at a certain place is not determinable of citizenship, and the action of the officers of election in permitting him to vote is not binding on the courts, but such evidence is admissible as a fact tending to show the intention of the party to make such place his domicil.

(5). The residence of a student is usually temporary, and hence results the presumption that the residence of the particular student is also temporary; it is therefore necessary in order to show the acquisition of domicil in the particular case, to overcome this presumption by suitable evidence.

JELKE, J.

Jacob H. Kaplan was born in Germany, December 28, 1874. In 1886 he came with his parents to the United States. His father took up his residence in the city of Buffalo, N. Y., opened a furnishing goods store and became a naturalized citizen. The relator says that he had from childhood cherished the purpose of following the ministry and becoming a rabbi; that about a year before he came to Cincinnati, he heard of this city as a center of reformed Judaism, and of the educational advantages offered here in the high schools, university of Cincinnati and the Hebrew Union College.

In 1894 the relator came to Cincinnati in company with his father. He was informed that if he was studying for the ministry, he would get his academic and theological instruction free. His father at that time had some small means and could contribute a little to the support of the relator, but had the tuition not been free and there been prospect that relator would have the opportunity to earn something himself and

[COPYRIGHT, 1901, BY CARL G. JAHN.]

receive assistance from the Hebrew Union College, Jacob could not have undertaken this course of instruction.

The father confided his son to the authorities of the college, and Jacob at the age of nineteen entered Hughes High School, where after three years, tuition free, he graduated and entered the University of Cincinnati.

After the first year of Jacob's stay in Cincinnati there was a change in his father's circumstances so that since that time he has received nothing toward his maintenance from that source, but has been supported by a stipend from the Hebrew Union College, a salary he receives as instructor in the Jewish Sabbath School of the Richmond Street Temple, and what he earns by private tutoring. About one-half of his whole maintenance comes from the Hebrew College.

In 1896 Jacob H. Kaplan voted, also in 1898 and 1899.

Mr. Kaplan says that when he first came to Cincinnati, he knew he could not return to Buffalo, but that his coming at that time was only for the purpose of getting an education. Since then, and since attaining his majority, he has chosen this as his city of residence; he says, "I have chosen this as my home."

Relator says that it is his present intention to complete his academic and theological studies, and he expects to graduate from the Hebrew Union College as a rabbi. He hopes that he may be then favored with a call from some Jewish congregation to officiate as its minister. The probabilities are greater that such call will come away from Cincinnati than from a congregation of this city.

In regard to his intention of making Cincinnati the city of his residence, relator was asked:

"Q. What is your present intention, Mr. Kaplan, in regard to removing yourself from Cincinnati? A. I have no intention whatsoever on the subject.

"Q. Mr. Kaplan, is it not rather your intention to go, but you don't know when or where? A. Well, my intention clearly is this: that I shall stay here until I shall get a better place as a rabbi of course, but if that does not come, then I have no other place to go except this city.

"Q. If you can't do that, you will stay here? A No; my intention is to stay here until I get somewhere else a position to better the position I have here, because I have something to make my living here."

Mr. Kaplan makes no tax return, and says that his clothes and his books are the only property he owns in the world.

Julius J. Gusfield was born at Columbus, Mississippi, in 1877; his parents were citizens of the United States at the time of his birth. He first heard of the Hebrew Union College and the educational advantages offered in Cincinnati, from a rabbi

visiting and officiating in Birmingham, Ala.

He came to Cincinnati from Birmingham first in 1892, returned to the south, and came back to Cincinnati 1894 or 1895, and has remained here ever since.

"Q. What was your purpose in coming to and remaining in Cincinnati? A. Well, my purpose in coming here was to rise in life. Birmingham being a smaller city, I saw there were no opportunities there afforded me, and knowing Cincinnati's reputation, not only for its educational but its commercial advantages, and all those things, I saw a splendid opportunity, and took advantage of it. Previous to my coming here I had a position in Birmingham, but it really didn't pay me to keep it, and although I had asked for an increase of salary, it was refused, and that decided me to a certain extent in choosing my present profession and coming here."

At another place, in reply to the question, "What attached you to Cincinnati", relator said:

"The fact that it was a Jewish center. I may say: great interests of Judaism are centered here; and the people are noted for their generosity for assisting the people that come here; and I thought if by chance I should ever leave college, or anything like that, I should have no difficulty in getting a position here, and settling here. I felt I should have a much better chance to rise here than I should in Birmingham, a smaller place," etc.

Since coming to Cincinnati, Mr. Gusfield has lived with the same family, boarding with them at 305 Richmond street and 724 Richmond street. At the latter place he has lived a little over six years.

"Q. Is it a regular boarding house? A. No, sir, I really consider it my home. I have no other home. My mother is dead, father boards, and this is really the only home I have; purely a private family, I am the only one of the students—the only outside one—in the family. I consider it a home, and always have.

"Q. What is your present intention with regard to removing from Cincinnati? A. I have none."

Mr. Gusfield voted either at the election in 1898 or 1899, the spring election, shortly after he was twenty-one years old.

Mr. Gusfield's intentions as to finishing his education, academic and theological, are similar to those of Mr. Kaplan, and similarly expressed, except that Mr. Gusfield manifested a little more willingness to settle down to commercial pursuits in the event of his failing to be called as a rabbi.

"Q. What are your intentions as to staying in Cincinnati after graduation? A. I can't answer that definitely either. Should circumstances be such that a favorable position be offered me—it all depends on the contingency arising—I may leave Cincinnati, should I fail to get a position, I expect to stay in Cincinnati and go to work here, not necessarily following my profession, because it may be impossible for me to do so."

Mr. Gusfield has some means of his own —an interest in property left by his mother, in Birmingham, Ala.—has earned money by managing the college paper, and received about one third of his total expenses from his father, who lives in Birmingham. All his personal property is in Cincinnati. He pays no taxes here.

———

The University of Cincinnati has been built upon the endowment left for that purpose by Charles McMicken, with such additional support as has been given by the tax levy made in accordance with law.

The provisions of the will of Charles McMicken, relating to this subject, are as follows:

"Having long cherished the desire to found an institution where white boys and girls might be taught not only a knowledge of their duties to their creator and fellowmen, but also to receive the benefit of a sound, thorough and practical English education, and such as might fit them for the active duties of life, as well as instruction in the higher branches of knowledge, except denominational theology, to the extent that the same are now or may hereafter be taught in any of the secular colleges or universities of the highest grade in the country, I feel grateful to God, that through his kind providence I have been sufficiently favored to gratify the wish of my heart.

"I therefore give, devise and bequeath to the city of Cincinnati and its successors for the purpose of building, establishing and maintaining, as soon as practical after my decease, two colleges for the education of white boys and girls, all the following real and personal estate, in trust forever, to-wit:

* * * * * *

"After the full and complete organization and establishment of the said institutions, and the admission of as many pupils as in the discretion of the said city should for the purposes of education be received, there shall remain a sufficient surplus of funds, the same shall be applied in making suitable additional buildings.

* * * * * *

"The establishment of the regulations necessary to carry out the objects of my endowment, I leave to the wisdom and discretion of the corporate authorities of the city of Cincinnati, who shall have the power to appoint directors of the said institution."

Revised Statutes, section 4100, provides, "The citizens of the said city whose children, wards, or apprentices are admitted to such institution, shall not be charged for such admission into the academic department; and no charge shall be made for the instruction of such pupils in the academic department. The board of

directors of such university may charge fees to students in other departments, and shall have power in its discretion, from time to time, to make the university free in all or any of its departments to citizens of Hamilton county, Ohio."

Revised Statutes, section 4104, provides, "'The board of education of the city may, upon the application of said board of directors, assess and levy a tax on the taxable property of the city not exceeding three-tenths of one mill on the dollar, valuation thereof to be appied by the board of directors to the support of such university, college or institution; and the board of education shall also assess and levy annually not less than three-hundredths, nor more than five-hundredths of one mill on the dollar of such valuation, for the establishment and maintenance of an astronomical observatory in connection with such university, college or institution, the proceeds of which shall be paid to the board of directors, and applied by them for said purpose exclusively."

The catalogue of the university for the year 1898-1899, on page 47, state: "Instruction is free to bona fide residents of Cincinnati."

It appears in the fiscal statement of the university, for the year 1898, that the amount received from the estate of Charles McMicken was $23.169.71, while the amount received from the treasurer of Hamilton county, taxes collected under special levy for the support of the university, was $40.027.65. Roughly speaking, about two-thirds of the income of the university comes from a special tax levied upon the property in the city of Cincinnati.

The relator in each of the above actions brings suit to obtain a peremptory writ of mandamus to compel the trustees of the university of Cincinnati to admit him to its classes, and to permit him to receive its instruction free of charge for tuition.

It was supposed and hoped by many interested in these two educational institutions, to wit: The Hebrew Union College and the University of Cincinnati, that these actions, as test suits, might invoke the court to determine and define in a general way the relation between them and their reciprocal rights.

But this manifestly cannot be, because no relation, organic, civic or of contract, is alleged or does in any fact exist between them. It is the relation of an individual who is incidentally a student of the Hebrew Union College, to the Cincinnati University which is here under consideration. It is only to the extent that an inquiry as to whether or not he is a bona fide citizen of Cincinnati, calls forth the enunciation of principles determinative of that issue, that any general light can be obtained which can be used in other cases.

Strictly speaking, each case must stand by itself. Each individual's or student's rights and privileges must yield to the fact of his own citizenship.

The inquiry then is: "Is Jacob Kaplan a bona fide citzen of Cincinnati?"

Section 1 of the 14th Amendment to the Constitution of the United States, provides,

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state where they reside."

Article 5, section 1 of the constitution of Ohio, provides,

"Every (white) male citizen of the United States, of the age of twenty one years, who shall have been a resident of the state one year next preceding the election, and of the county, township or ward in which he resides, such time as may be provided by the law, shall have the qualifications of an elector, and be entitled to vote at all elections.

The Roman law recognized two kinds of connection between a person and an urban community; citizenship (origo) and domicil (domicilium). This distinction has been more or less preserved in continental jurisprudence, fading away under the influence of the principle of "nationality or race descent" during the unsettled and wandering period of European history, and revived with the settling down in definite locations of the various nations, and bounding of their countries. With the adoption of codes, notably the code Napoleon, this distinction seems to have again yielded to "political nationality," and there is much difference of opinion among continental jurists as to how much domicil controls citizenship.

Mr. Jacobs says: "In British Jurisprudence, domicil finds its main application for the purpose of ascertaining which or several conflicting territorial laws is applicable to the determination of certain legal questions arising between individuals."

"In American jurisprudence domicil is similarly applied, but it is also very extensively used for the determination of the rights and duties of individuals under the municipal law, and particularly for the ascertainment of the place where such right may be enjoyed and such duties must be performed."

Generally speaking, in the United States, citizenship may be said to depend upon domicil. This is true for the purpose of jurisdiction of the federal courts on the ground of diverse citizenship. Jacobs on Law of Domicil, sec. 43; Also see section 51, 52, 73, 75; Poenhauser v. India Rubber Comb. Co., 14 Fed. Rep., 707; Dillon on Municipal Corporations, 4th Ed., par. 40; Dem Gardner v. Sharp, 4 Wash. C. C., 614; Oakes v. Hill, 10 Pickering (27 Mass.), 346.

Referring to the standard laid down by the terms of the gift by Mr. McMicken, the law, and the rules and regulation of the University for free tuition, we find it is confined to bona fide residents of Cincinnati. We find the words used in both the federal and state constitutions to be "citizen" and "resident" or "reside".

"Residence" is the favorite term employed by the American legislator to express the connection between person and place, its exact signification being left to construction to be determined from the context and the apparent object to be attained by the enactment." "Residence" when used in statutes is generally construed to mean "domicil." Jacobs on Domicil, sec. 75, and large number of cases cited under note 2.

"In general, the term "residence" implies the place of domicil, the place where a person has his home, and where he has gained a residence." Horton v. Horner, per Birchard, C. J., 16 O., 148.

"The word 'residence' as used in the constitution has substantially the meaning of 'habitation, 'domicil' or place of abode." Sturgeon v. Korte, Boynon, J., 34 O. S., 534.

"What constitutes a person a resident of Ohio, for the purpose of voting, or admission to the public schools or benevolent institutions of the state, for the administration of estates, and in other cases, has been a frequent matter for consideration. There is no substantial difference between the words residence and domicil in regard to these matters, though they are not always synonyms." Grant v. Jones, per Johnson, C. J., 39 O. S., 515; Cooley's Constitutional Limitations, 6th Ed. p, 754; Guier v. O'Daniel, 1 Hare & Wallace, 743; s. c., 1 Binney, 349 355; See also discussion and cases cited in notes on pp. 57-66 of Story of Conflict of Laws, 8th Ed.; Endlich on Interpretation of Statutes, sec. 519; Cessna v. Meyers, McCrary on Elections, p. 559.

"Domicil is said to have its nearest equivalent in untechnical or colloquial language in the word "home." Dicey on Conflict of Laws sec. 80-7; Jacobs on Domicil, sec. 70-1; Cesna v. Meyers, McCrary on Elections, 559; Michell v. U. S., 21 Wallace, 350; Venable v. Paulding, 19 Minn., 488; Dicey on Conflict of Laws, Chap. II, pp 80-90.

It would be presumptuous and vain and beyond the necessary scope of this opinion to attempt a definition of the legal concept contained in the word "domicil", or even to attempt to discriminate among the many definitions put forth by the ablest jurists of this country, England and Europe. No definition being entirely satisfactory or meeting every aspect of the idea contained in the word. See Jacobs on Domicil, chap. III, sec. 57 to 77 inclusive: Le Droit International, 2 Calvo, p., 153;

"Domicil expresses the legal relation existing between a person and the place where he has, in contemplation of every law, his permanent home."

I am of the opinion that the answer to the question, "Is Jacob H. Kaplan's domicil in the city of Cincinnati?" determines his right to free tuition in the University of Cincinnati, and decides this case.

This brings us within the language of the adjudicated cases. While legislators have talked about "citizens" and "residents," courts have always examined questions of "domicil." Domicil has been divided into national, quasi-national and municipal domicil.

In the case at the bar we have to do with quasi-national domicil, inasmuch as Jacob H. Kaplan has come from the state of New York into the state of Ohio, but more particularly with municipal domicil, because it is Mr. Kaplan's relations, rights and privileges as a resident of the city of Cincinnati, which are here involved.

For the purpose of this case the distinction is of little importance, for three reasons:

1. The two kinds of domicil are determined by precisely the same criteria.

2. While it is said that municipal domicil can be changed more easily, and more lightly put off and assumed than quasi-national domicil, and that the rules of construction as to quasi-national domicil are more strict, yet the people of this country move with as much freedom from state to state as from city to city, and the measure of proof would vary but little.

3. No question of state law is involved.

In determining Jacob H. Kaplan's domicil there are first four general rules:

1. Every person must have a domicil somewhere.

2. No person can at the same time have more than one domicil.

3. Every person who is sui juris and capable of controlling his personal movements may change his domicil at pleasure.

4. A change of domicil is a question of act and intention.

Strictly speaking Jacob H. Kaplan's domicil of origin was in Germany; that however was changed by the act of his father by removing to Buffalo, New York, and there becoming a citizen of the United States and of that city; and at the time of coming to Cincinnati, and certainly up until he became of age, his domicil continued to be in Buffalo, New York.

A question arises as to the applicability to Jacob H. Kaplan's case as between Buffalo, New York, and Cincinnati, Ohio, of the following rule: "It requires stronger proofs to show the acquisition of a domicil of choice, in derogation of a domicil of origin, than the substitution of one domicil of choice for another." Jacobs on Domicil, sec. 122. I conclude that the rule

applies. While Buffalo is not strictly his domicil of origin, it is the domicil with which he finds himself clothed when he becomes sui juris.

Did Jacob H. Kaplan change his domicil from Buffalo to Cincinnati? "The onus of proving a change of domicil is on the party who alleges it." Law Reports Scotch Appeals, vol. 1, p. 307.

The abandonment or change of domicil is a proceeding of a very serious nature, and an intention to make such a change requires to be proved by very satisfactory evidence. Jacobs on Domicil, sec. 124.

All jurists agree that a change of domicil, of whatever grade, is a question of "act" or "fact" and intention, and cannot be accomplished without the concurrence of both. Jacobs on Domicil, sec. 125. Dicey on Conflict of Laws, pp. 104-110; Am. & Eng. Encyl., 2nd Ed. "Domicil," pp., 18 & 19.

In the case of Jacob H. Kaplan we have the factum complete in the transfer of his bodily presence from the old place of abode to the new, and his continuance here.

In the matter of his intention there are three elements:

(1) Capacity to choose.

(2). Freedom of choice.

(3). Actual choice.

In the case at bar there is no doubt about the first two elements.

In order to constitute the requisite animus or intention amounting to an actual choice, two states of mind must concur:

(1) Animus non revertendi; and (2) Animus manendi.

If we are to rely on Jacob H. Kaplan's own statements as to his animus, the animus non revertendi is very positive. From his own statements the animus manendi is indefinite but contingent.

How far a merely contingent animus manendi will suffice for a change of municipal domicil is not at all clear. In Putnam v. Johnson, Parker, J., said: "In this new and enterprising country it is doubtful whether one-half the young men, at the time of their emancipation, fix themselves in any town with the intention of always staying there. They settle in a place by way of experiment, to see whether it will suit their views of business and advancement in life; and with an intention of removing to some more advantageous position, if they should be disappointed. Nevertheless, they have their home in their chosen abode while they remain. But it is certainly not every contingent residence in a place which will establish a domicil there. Much, doubtless, will depend upon the nearness or remoteness of the contingency, and upon the extent to which the former place of abode has been abandoned. If the latter clearly appear to have been finally abandoned, the court are disposed to require animus manendi of much slighter character than if it remain in doubt, or be mainly inferible from the nature of the animus manendi." Jacobs on Domicil, sec. 188.

The fact that the whole matter turns upon the animus or intention, is what invests these cases with peculiar difficulty. The cardinal fact being mental, it is hard to discover, and liable to misconstruction and dispute. It is provable in two ways: (1) by the testimony of the person himself; (2) inferentially or inductively by the proof of other facts, physical and external, which may indicate the mind of the person. "Acta exteriora indicant interiora secreta.' 8 Coke R., 291.

It would be unsafe and unwise to rely implicitly on testimony of the first class in all cases, for manifest reasons. The second class opens up the widest possible range of testimony, going into the person's whole life and all its conditions and circumstances.

It was said in the case of Wilson v. Wilson, British Law Reports, 2 Probate p., 435: "The oath of the person whose domicil is in question, as to his intention to change his domicil, is not conclusive, but the question for the court is whether upon a view of all the circumstances, it gives credit to his evidence."

In the course of the trial certain testimony was permitted to be introduced, showing that the relator, Jacob H. Kaplan, had been, by the officers of election, allowed to exercise the elective franchise and vote several times since becoming of age. To this testimony counsel of the university objected on the ground that "the act of voting is the result of citizenship, not the cause of citizenship."

To the extent that the act of voting might be in any way determinable of citizenship, the objection is well taken. The officers of election may have made a mistake, and at best their decision as to citizenship cannot have weight or be in any sense binding upon this court. That is the very issue here for trial.

But as showing intention the testimony was admissible. The relator is permitted to testify directly as to his intention in the matter of his residence at various times during and since his presence in Cincinnati, and his testimony is permitted solely for the purpose of showing his intention formed and expressed at the time of voting, and declared under circumstances of peculiar solemnity, and in a manner causing him to assume and subject himself to all the duties responsibilities and liabilities of citizenship. Such testimony is only competent as an emphatic declaration

of intention at that time, and in no way conclusive upon his rights.

"With respect to the evidence necessary to establish the intention, it is impossible to lay down any positive rule. Courts of justice must necessarily draw their conclusions from all the circumstances of each case; and each case must vary in its circumstances; and, moreover, in one a fact may be of the greatest importance, but in another the same fact may be so qualified as to be of little weight." Dr. Lushington, speaking for the Privy Council in Hodgson v. Beauchesne, 12 Moore P. C. C., 285, 330.

We must look to the acts and declarations, family relations, business pursuit and vocation in life, mode of life, means, fortune, earning capacity, conduct, habits, disposition, age, prospects, residence, lapse of time; voting and payment of taxes, and read these facts in the light of their own declarations.

The most conspicuous condition of Jacob H. Kaplan's life is his studentship:

"One who goes to a place for the sole purpose of attending a school or university, intending to remain for a limited time, does not thereby gain a domicil. His stay is only temporary, and is to be treated like any other temporary residence. It sometimes happens, however, that when study is one of the purposes, or even the main purpose of residence in a place, there exists the ulterior intention of remaining there permanently after the period of study is at an end. In such case there can be no doubt that domicil is acquired. Up to this point, the case of a student differs in nothing from that of any other person. He does not gain a domicil by intention to reside temporarily, and he does gain a domicil by intention to reside permanently; and where his intention clearly appears, the fact of his studentship is of no significance whatever. But when we come to consider residence as a proof of animus manendi, we are met by the fact that the residence of a student is usually temporary; and as hence results the presumption that the residence of the particular student is also temporary, it is necessary, in order to show the acquisition of domicil in the particular case, to overcome this presumption by suitable evidence. This is the ratio of all the cases in which the question of the domicil of students has been considered." (Jacobs on Domicil, sec. 325.)

The whole subject was gone over thoroughly and accurately by the justices of the supreme court of Massachusetts, in an opinion rendered by them to the house of representatives of the state, in answer to the following question: "Is a residence at a public institution, in any town in this common- wealth, for the sole purpose of obtaining an education, a residence within the meaning of the constitution, which gives a person, who has his means of support from another place, either with in or without this commonwealth, a right to vote, or subjects him to the liability to pay taxes in such town?" Much that is contained in the opinion relates to the indicia of domicil—but as all that was said has direct bearing upon the domicil of students, the opinion is here given at length: "We feel considerable difficulty in giving a simple or direct answer to the question proposed, because neither of the circumstances stated constitutes a test of a person's right to vote, or liability to be taxed; nor are they very decisive circumstances bearing upon the question. On the contrary, a person may, in our opinion, reside at a public institution for the sole purpose of obtaining an education, and may have his means of support from another place, and yet be will, or will not, have a right to vote in the town where such institution is established, according to circumstances not stated in the case, on which the question is proposed. By the constitution it is declared, that, to remove all doubts concerning the meaning of the word 'inhabitant,' every person shall be considered an inhabitant, for the purpose of electing and being elected into any office or place within this state, in that town, district or plantation, where he dwelleth or hath his home. In the third article of the amendments of the constitution, made by the convention in 1820, the qualification of in habitancy is somewhat differently expressed. The right of voting is conferred on the citizen who has resided within this commonwealth, and who has resided within the town or district, etc. We consider this description, though differing in terms, as identical in meaning, and that 'inhabitant,' mentioned in the original constitutior, and 'one who has resided,' as expresed in the amendments, designate the same person. And both of these expressions, as used in the constitution and amendment, are equivalent to the term 'domicil, and therefore the right of voting is confined to the place where one has his domicil, his home or place of abode.

"The question, therefore, whether one residing at a place where there is a public literary institution, for the purpose of education, and who is in other respects qualified by the constitution to vote, has a right to vote there, will depend on the question whether he has a domicil there. His residence will not give him a right to vote there if he has a domicil elsewhere; nor will his connection with a public institution, solely for the purpose of education, preclude him from so voting, being otherwise

qualified, if his domicil is there.

"The question, what place is any person's domicil or place of abode, is a question of fact. It is in most cases determined by a few decisive facts; but cases may be readily conceived where the circumstances tending to fix the domicil are so nearly balanced that a slight circumstance will turn the scale. In some cases, where the facts show a more or less frequent or continued residence in two places, either of which would be conclusively considered the person's place of domicil but for the circumstances attending the other, the intent of the party to consider the one or the other his domicil, will determine it. One rule is that the fact and the intent must concur. Certain maxims on this subject we consider to be well settled, which afford some aid in ascertaining one's domicil. These are, that every person has a domicil somewhere; and no person can have more than one domicil at the same time, for one and the same purpose. It follows from these maxims, that a man retains his domicil of origin until he changes it by acquiring another. And it is equally obvious that the acquisition of a new domicil, does, at the same instant, terminate the preceding one.

"In applying these rules to the proposed question, we take it for granted that it was intended to apply to a case where the student has his domicil of origin at a place other than the town where the institution is situated. In that case, we are of the opinion that his going to a public institution and residing there solely for the purpose of education, would not, of itself, give him a right to vote there, because it would not necessarily change his domicil; but in such case his right to vote at that place would depend on all the circumstances connected with such residence. If he has a father living; if he still remains a member of his father's family; if he returns to pass his vacations; if he is maintained and supported by his father—these are strong circumstances, repelling the presumption of a change of domicil. So, if he have no father living; if he have a dwelling house of his own, or real estate, of which he retains the occupation; if he have a mother or other connections, with whom he has before been accustomed to reside, and to whose family he returns in vacations; if he describes himself of such place, and otherwise manifests his intent to continue his domicil there—these are all circumstances tending to prove that his domicil is not changed.

"But if, having a father or a mother, they should remove to the town where the college is situated, and he should still remain a member of the family of the parent; or if having no parent, or being separated from his father's family, not being maintained or supported by him; or if he has a family of his own, and removes with them to such town; or by purchase or lease takes up his permanent abode there without intending to return to his former domicil; or if he depend on his own property, income or industry for his support—these are circumstances more or less conclusive, to show a change of domicil, and the acquisition of a domicil in the town where the college is situated. In general it may be said that an intent to change one's domicil and place of abode, is not so readily presumed from a residence at a public institution for the purposes of education, for a given length of time, as it would be from a like removal from one town to another, and residing there for the ordinary purposes of life; and therefore stronger facts and circumstances must concur to establish the proof of change of domicil in the one case than the other. But where the proofs of change of domicil, drawn from the various sources already indicated, are such as to overcome the presumption of the continuance of the prior domicil, such preponderance of proof, concurring with an actual residence of the student in the town where the public institution is situated, will be sufficient to establish his domicil, and give him a right to vote in that town, with other municipal rights and privileges.

And as liability to taxation for personal property depends on domicil, he will also be subject to taxation for his poll and general personal property, and to all other municipal duties in the same town." (Jacobs on Domicil, secs. 329, 330 and 331.)

I have quoted thus fully from Jacobs, because it sums up the statements of a large number of cases, and the subject is so varied in its aspects, and so dependent on general principles, that it is not susceptible of more succinct statement.

In this connecton the following authorities may be read: Dicey on Conflict of Laws. p. 152; Am. & Eng. Encyl., 2nd Ed. Domicil, p. 36; Dale v. Irwin, 78 Ill., 170 & 182; Paine on Elections, par. 69 & 70; McCrary on Elections, par. 101 Cesna v. Meyers, supra; Cooley on Const. Limitations 6th Ed., 755; Putnam v. Johnson, 10 Mass., 488, McCrary on Elections, 4th Ed. Sec. 101; Hart v. Lindsay, 17 N. H., 235; Sanders v. Getchell, 76 Maine, 158; Lower Oxford Contested Election, 11 Phila. R., 641. The case of Perry v. Reynolds, 53 Conn., 527 is almost on all fours with the case at bar. Pedigo v. Grimes, 113 Indiana, 148; Shaeffer et al. Gilbert, 13 Maryland, 67; Hall v. Schoenecke, 128 Missouri, 661; Berry v. Wilcox, 44 Nebraska, 82; In re Ward, 20 N. Y. Supp.

606; Fry's Election case 71 Penns. St., 302; In re Garvey, 147 N. Y., 117; In re Goodman, 146 N. Y., 284.

Taking these general principles and applying them to the facts in Jacob H. Kaplan's case, and being persuaded of the sincerity and veracity of his declarations, I find all the facts and circumstances surrounding him consistent and reconcilable with such declarations, and conclude that since becoming of age he has abandoned Buffalo as the place of his domicil and has in good faith adopted the city of Cincinnati as the place of his domicil, and has become a resident and citizen of this city.

I am therefore of the opinion that under Charles McMicken's will, the statute R. S., 4100, and the rules and regulations of the university of Cincinnati, Jacob H. Kapplan is entitled to free tuition.

The case of Julien J. Gusfield stands by itself, as indeed each case of this kind must, but in its essential features I find it very similar to Mr. Kaplan's case. I have an impression that it is not quite as strong a case. Mr. Gusfield, on account of property interests, has ties connecting him with Birmingham; moreover he is not supporting himself by his own exertions to the full extent that Mr. Kaplan is, receiving the principal part of his maintenance from his father and his property, both being in Birmingham. On the other hand, if Mr. Gusfield does not receive a call as a rabbi soon after graduation, he seems to be more apt to turn to commercial pursuits, go into business, and settle down in this community.

On the whole, taking the facts into consideration with his solemn declaration under oath, I conclude that Julien J. Gusfield since attaining his majority has abandoned Birmigham as the place of his domicil and has become a resident and citizen of this city. I am therefore of the opinion that under Charles McMicken's will, the statute R. S.. 4100, and the rules and regulations of the university of Cincinnati, Julien J. Gusfield is entitled to free tuition.

The difference between the cases of these two relators illustrates that each case must necessarily stand by itself, and the delicate shades of fact which may determine a case one way or the other, a case not quite so strong as one of these might very well be resolved the other way.

In closing, I cannot refrain from complimenting and thanking counsel or both sides of these cases for their able and exhaustive preparation, their earnest and frank pursuit of truth, and justice, and the valuable assistance thereby rendered to the court.

The alternative writs will be made peremptory.

Alfred Bettman, A. Julius Freiburg, Graham P. Hunt, for Relators.

Ellis G. Kinkead, George Kattenhorn, Oscar W. Kuhn, for Respondents.