Gray, J.
The record before us shows that the question which it presents has received a careful consideration in the courts below, and we might leave the discussion there if it were not a question which, as concerning the powers of inspectors of elections, in holding state elections, affects the right of suffrage and, therefore, is of public interest. The precise claim of the appellants amounts to this: that those officers are clothed with a discretionary power to reject the ballot tendered by a proposed elector, notwithstanding he may have satisfied the tests prescribed by law by taking the oaths and fully answering the questions put to him, if they doubt his identity with the registered elector whose name he gives at the polls. In other words, that they may act, nevertheless, upon their own private opinions and knowledge. That claim arrogates to them judicial powers and *961 ■ support for it must be found in the law regulating elections» either in express words, or as implied, from being necessarily incidental to the office and to the proper exercise of its duties.
• The right of suffrage is one of the most valuable and sacred rights which the constitution has conferred upon the citizen of the state. About it have been erected many safeguards, with the object of securing to each qualified elector the fullest and freest exercise of his constitutional privilege and also of obtaining the greatest •protection against the perpetration of frauds at the polls which.shall be consistent with a certainty that every person entitled to vote shall have his ballot received, deposited and counted. It may properly be observed in this connection that, in addition to the legal requisites, the public nature of the proceedings, through which the • elector entitles himself to cast a ballot, and the public manner in • which he presents himself to cast it at the polls, are features in our ■ elections which tend to minimize the possibility of false persona■tions and other fraudulent practices in elections.
• I think it would be a far greater menace to the security of thifs constitutional right, if the law regulating its exercise might prevent .the vote of a citizen, duly qualified to cast it, from being received and counted, than that some fraud might be practiced by a false .personation. For, in the one case, there would be the disfranchisement of the elector; while in the other, for the wrong done to the people, or to the individual, penalties and remedies are provided, and tribunals exist for their enforcement against a wrong•doer and for the establishment of the right. There are no complex ' features in this case and it can be briefly stated. At the last general election in this state the two relators and two defendants composed the board of inspectors of election; the former being the • democratic and the latter the republican members thereof. After dhe closing of the polls, the inspectors counted the ballots which 'had been cast, and the results of the counting were thereupon proclaimed. But to the election return, containing a statement •of such results, the defendants refused to affix their signatures as required by law. In opposition to the application of ' the relators for an order compelling them to sign the return, the •defendants objected, in substance, that fraudulent votes were received during the election, from persons falsely personating registered voters and who were not themselves registered; that upon •their votes being offered, their receipt was objected to ; the “ persons were challenged and sworn and their answers were unsatisfactory ; ” that said ballots were not received by the board or bv .a majority thereof, but were taken and deposited by the relators ■in the ballot boxes, contrary to the protest of the defendants. It does not appear, however, that any minutes or record was made of •such attempts or objections; although the affidavit of the defend•ants states somewhat indefinitely that “ at least seventy fraudulent •votes were offered at the polls.” The allegation was not put in issue by any denial and we must take it to be true. The gravity of the offense cannot be overrated and calls for the severest expressions of condemnation. Such practices are as dangerous to the
*962 ■rights of citizens, as they are odious; and when suffered to go un- • noticed and unpunished reflect disgracefully upon the community. If unchecked by punishment, the electoral franchise is subjected to further attacks by dishonest partisans, emboldened by past immunity to themselves or others, to affect the result of elections by fraudulent personations and other devices. But we are confined,, in our discussion here, to the legal question of what exercise of powers is permitted under the existing laws.
We must assume that the person, whose right to vote was challenged, submitted to all the statutory tests prescribed by the law-in such cases; for the appellants concede that he was “sworn " and only allege that his “ answers were unsatisfactory.” They did not claim that his answers were not full; or that he was disabled by reason of any conviction. Their position is that they had knowledge that persons offered ballots who were not the registered electors they claimed to be and were not registered at all; and their argument is that notwithstanding those persons satisfied the statutory tests, such questions are always outstanding for the determination of the board, which only a majority can make.
I must say that to my mind this claim is as unreasonable as it •is absolutely lacking in support in the fundamental or statutory -law. It is repugnant to fundamental principles and to authority. I may fairly premise what brief discussion I may feel bound to • enter upon, in connection with the law regulating elections in this ■ state, with the remark that if these appellants are right in their - contention, then a way -is made possible to perpetrate a great out- ■ rage upon the rights of electors. Under the present scheme of •non-partisan boards of election inspectors, wherein the principal -political parties in -the state are intended to have equal representation, by a contumacious refusal of party adherents to sign an election return, based on the pretense that they were not satisfied in their minds that all of the ballots taken were cast by qualified and registered electors, the disfranchisement of all the electors in the election district could be effected. • They could prevent, the reception of a ballot from a proposed elector, on their theory that ■ a ballot is not finally received until by action of the majority of the board; for they would only have to oppose to the proofs re- ■ quired by the election law and made by the person their mental • convictions that, notwithstanding them, he was not the elector he swore he was. I do not, and cannot think such a result was.ever • intended, or can be fairly reached upon a consideration of the law. It is inconceivable that any such power should be lodged in elec- ■ tian inspectors; or that they should be clothed with a discretion to reject a ballot offered by a proposed elector, whose qualifications, in case of challenge, are proved by the statutory methods.
The constitution of the-state provides that the citizen, fulfilling ■ the stated conditions of age, citizenship and residence, shall be en- ■ titled to vote at the election; and it is thereby left to ■ the legislature to enact laws excluding persons from the right of suffrage "who have been convicted of bribery, or infamous crime, and for .ascertaining by proper proofs the electors who shall be entitled to exercise that right.. The legislature accordingly has enacted laws *963 regulating tlie holding of elections ; and therein have provided, as a prerequisite to the right of the elector to vote, that he should be registered before the day for holding the election. Registration is the method of proof prescribed for ascertaining the electors who are qualified to cast votes and the registers are the lists of such electors.
It is a part of the machinery of elections and is a reasonable regulation, which conduces to their orderly conduct and fairness. It is one safeguard against frauds; for it is a means for furnishing all the electors of the district with the knowledge of what persons will claim the right of voting a sufficient time in advance of the election.for them to act upon it, if necessary. For the present purpose I shall only refer to the chapter of election laws, so far as portions of the laws bear upon the phase of the question under consideration.
The inspectors of election, m this particular case, were appointed by the board of police commissioners of the city of Troy, under the provisions of a special law. When appointed they had, of course, such duties to perform as are mentioned in the general laws regulating the holding of elections. When the polls are open the first duty imposed upon the inspectors is for one of their number to receive the ballot tendered; for the law provides, § 7 of art. 2 of title 4, that each elector shall deliver his ballot “to one of the inspectors in the presence of the board.” If, then, he shall be challenged as to his right to vote by an inspector, or by any other person entitled to object, an inspector shall tender him a preliminary oath, to the effect that he will “fully and truly'! answer ” all questions touching his residence and qualifications as an elector. Section 13. Thereupon questions of a certain prescribed nature are to be put to him, and all other questions tending to test his qualifications to vote. Section 14. If he “ shall refuse to take the preliminary oath, when so tendered, or to answer fully any questions which shall be put to him, his vote shall be rejected.” Section 15. If he shall appear to the board from his answers to be deficient as to qualifications, it must be nointed out to him in what respect. Section 16.
In the present case the only claim is that the answers, after the persons were sworn, were not satisfactory. That certainly falls short of an allegation that full and true answers were not made. Of course, what is meant is that, while the answers were full, they did not satisfy or remove a doubt in the minds of the defendant inspectors as to the identity of the proposed electors. But as the statute only requires the oaths and full answers to questions, if the person does that much, these provisions of the law do not warrant the exercise of judicial powers, under which the inspectors can still assume to deny the right of the proposed elector.
But, further, the law provides, § 17, that “if the person so offering shall persist in his claim to vote, and the challenge shall . not be withdrawn,” the inspectors shall administer to him a general oath; in which he states in detail that he possesses all the constitutional and legal ’ qualifications. This second, or general, oath is a clear indication of a lack of any discretionary power in *964 inspectors to reject the vote of a person, even if he has failed to satisfy them as to his qualifications under the first oath prescribed. And it is provided with 'respect to this latter oath, §' 19, that “ if any person shall refuse to take the oath so tendered, his vote shall be rejected.” This is significant language; for it is equal to saying that if he does take the oath, Ins vote shall be received. I think that plainly enough these provisions, which have been referred to in defining the cases where a vote shall be rejected, impliedly exclude .any other case, and deprive the inspectors ©f any discretion in the premises. Article 3 of title 3 treats of the duties of the board of inspectors, and I find nothing there from which any such power can be implied as is here claimed. It is there made the duty of each inspector to challenge every person .offering to vote, whom he shall know or suspect not to be duly-qualified as an elector. Section 31. But, when he has done so, he cannot do more than put in operation the test system or machinery described. And the statute makes it the inspectors’ duly to keep a minute of their proceedings, in respect of the challeng.ing and the administering of oaths, and to make return of it;but that does not appear to have been done here either. Sectian 22.
But a point is made upon the wording of § 28 of the third article of this general election law. It reads that “ when the board shall have finally received the ballot of an elector,” one of the ia■'spec tors shall deposit it, etc.; and it is argued that to be “ finally received by the board” its reception must be agreed to by a majority of the members. The argument does not seem to me a sound one. The board has' no discretion to reject the vote of -a .¡person who has satisfied the statutory tests, and, when that is .¡done, his vote must be deposited, and that is the time when, in [legal contemplation, it is finally received.
The language of the section is divested of its technical, or literal, meaning by force and operation of the context and of the provisions in pari materia, which support and give reason for its existence. Where a voter is challenged, there are several steps to be taken and things to be done by the inspectors as well as by the voter, and which the statute had previously defined and commanded. So “finally” must be taken, obviously, to refer to the conclusion of the proceedings preliminary to the establishment of the voter’s right to have his ballot received and deposited. In mentioning the “ board ” this section cannot be deemed to indicate united, or majority action, if we are right in saying that they are ministerial officers, without the power of judging and deciding on their own opinions when the voter has complied with the prescribed tests of the election law. Any inspector can deposit the ballot and it is received, in legal contemplation, by the board of inspectors when, after the elector has delivered his ballot to one of the inspectors, he has overcome a challenge by satisfying the statutory tests. The inspector has held the ballot delivered, to him and after the tests are concluded it is then only legally deemed to be received. And how? Why, by force of the provisions of the act, as Judge Denio says in People v. Pease, 27 N. *965 Y., 45. If anything was left by the law to the judgment of inspectors, then there would be some force in the argument that they, or a majority of them, should determine by vote upon the rights of the proposed elector. But to say that the right of the elector to cast* a ballot is subject to board action is equivalent to saying that they have power to decide upon the evidence as to the lawfulness of the vote. That cannot be so. That would permit of an elector’s rights being adjudged away and himself disfranchised, and on only such evidence as the statute prescribes. The lawfulness of a vote cannot be determined until it has been received, and an elector’s rights cannot be annulled without a trial, where he may have an opportunity of bringing forward his proofs and having them passed upon in a proper way and by a proper tribunal. To hold any other doctrine we would have to disregard the spirit of our laws and the fundamental idea of an electoral franchise.
As was said by Mr. Justice Allen, who delivered the opinion at general term in People v. Pease, 30 Barb., 588, “they cannot summon witnesses or impanel a jury or give the party interested a hearing. They can examine the proposed elector under oath and there their power and means of judicial investigation cease.” That this is the general sense with respect to this language is further illustrated by a reference to the “Election Code,” a compilation of election laws made, under the authority of a concurrent resolution of the legislature, by the secretary of state. In § 704 it is said, “when finally received by the board, either without challenge or after a challenge has been so disposed of as to authorize the person offering the ballot to vote, it is required to be deposited by one of the inspectors, without being opened,” etc. This direction does not contemplate action as a board,[1] literally; for if there is no challenge, certainly no such action would be called for. Then, again, it speaks of a challenge being disposed of so as to authorize the person to vote and says that one of the inspectors is required to deposit the ballot. Such language is indicative of a legal duty, or obligation, and not of an exercise of discretion and is one which any inspector may perform. I do not think the doctrine ought to receive encouragement from this or any other court.
I think we cannot hold otherwise as to inspectors of elections than that they are, under the provisions of the election law, made ministerial officers wholly, for their duties are pointed out by the law definitely. They are only officers to execute the law in a prescribed and definite way and to whom no latitude is allowed, when the proposed elector satisfies the statutory demands upon him for oaths and answers to certain questions. They are bound to an exact obedience of the particular commands which the law has laid upon them as its officers and they may not act on their own opinions or knowledge. The duty of an inspector is discharged when he has required the challenged voter to submit to the tests prescribed. In support of the view that inspectors of election act ministerially and not judicially, in holding elections and making returns, -we have ample authority. As far back as *966 the case of Ashby v. White, 8 State Trials, 89,130, Lord Chief Jus- ' tice Holt’s opinion was given upon the nature of a returning officer’s office. That officer was a person to whom the instrument, under which the election was immediately held, was directed, and, also, was to make the return as to the vote. Stephens on Elections, 74.
A majority of the lords in reversing the king’s bench, which had sustained the action of the returning officer in rejecting a vote, agreed with the opinion of Lord Holt as to the want of judicial capacity in a returning officer. It was held, p. 130, “ that the officer is only ministerial in this case and not a judge, nor acting in the judicial capacity, is most plain. His business is ■ only to execute the precept to assemble the electors, to make the election by receiving their votes, computing their numbers, declaring the election and returning the persons elected.”
In People v. Pease, 27 N. Y., 45, the judges were unanimous on the point that inspectors acted ministerially; Denio, J., who delivered a dissenting opinion on other questions in the case, disclaiming any reliance upon the judicial character of the inspectors and remarking that “if the inspector performs his duty by tend-. ering and administering both oaths, the voter does not deposit his ballot by the permission or sufferance of the inspectors in any legal sense, but by the provisions of the act.” Judge Selden carefully discusses the question and reviews authorities, and I think his views are most pertinent here, He said that inspectors “ are required to act upon the evidence which the statute prescribes, and have no judicial power to pass upon the question of its truth or falsehood; nor can they act upon their own opinion or knowledge.” The registry act was not in existence when that-case arose, but Judge Selden took occasion to say, with reference to it, that (p. 69) “ if it had been it would not have changed the aspect of the present question. Its only effect in this respect is to require two oaths instead of one, making the oath equally conclusive in each case.” And in Goetcheus v. Matthewson, 61 N. Y., 420, the commission of appeals reaffirmed the doctrine of the ministerial nature of the inspector’s office.
Judge Cooley, in his work on Constitutional Limitations, 617, treating the general subject of the elector’s rights, says that “ the oath is the conclusive evidence on which the inspectors are to act, and they are not at liberty to refuse to administer it, or to refuse the vote after the oath has been taken. They are only ministerial officers in such a case, and have no discretion but to obey the law and receive the vote.” He refers in support of his propositions to the People v. Pease, and to decisions in several other states.
Practically, the law leaves it to the conscience of the person offering to vote to decide whether he can or will do so, when his right is challenged. The inspectors cannot do more than to make use of the machinery provided by the law tó test the voter’s legal qualifications, and they cannot decide upon the truth or falsity of the answers to their questions. The law provides for the punishment of a person who falsely personates a registered voter and the proposed elector who is challenged for that cause if he persists m *967 his attempt to vote, may accomplish his purpose, but at the peril •consequent upon false swearing and of false personation. If, with all the safeguards with which popular elections are legally and naturally surrounded, frauds are perpetrated, the tribunals are open and laws and a system of procedure exist for the punishment of the offenders and for the rectification of consequent errors, in behalf of an individual whose legal rights are affected, and legislative bodies are judges as to the qualifications, returns and elections of their members.
The election return or certificate is not a conclusive proof of the right of a person to the office. It is nothing more than evidence of the right, and, like all other proof, may be the subject of inquiry and of disproof. It is the statement of the whole number of ballots taken for each candidate for office, and that is its whole probative force in an inquiry competently instituted with respect to the right of the person claiming office under the election returns. It is only prima facie evidence, and may be impeached ■and set aside for errors and frauds. People v. Thacher, 55 N. Y., 525. Andrews, J., said in that case, that it was “the disposition of the courts in this state, in election cases, to look through the formal evidence of the right to the right itself and to set aside the return of election officers when necessary to promote the ends of justice.”
If a person claiming the right to cast his ballot shows himself to be qualified to do so by the application of statutory tests, he should not be deprived of that right by any action of the authorities, state or local. Ample means are provided for holding him for punishment, if-believed and charged to be guilty of a violation of the law, and ample means exist for the rectification of the result affected by his acts. It follows that all votes cast must be counted and returned, and the signature by every inspector to the certificate containing the statement required by law, is obligatory upon him.
I have discussed this appeal at some length, but the public nature of the question is my warrant for doing so.
The order appealed from should be affirmed, but without costs.:
All concur.