Matter of Amedure v State of New York (2024 NY Slip Op 04295)

Matter of Amedure v State of New York

2024 NY Slip Op 04295

Decided on August 23, 2024

Appellate Division, Third Department

Garry, P.J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:August 23, 2024

CV-24-0891

[*1]In the Matter of Rich Amedure et al., Respondents,
v
State of New York et al., Appellants, and Minority Leader of the Senate of the State of New York et al., Respondents, et al., Respondent.

Calendar Date:August 15, 2024

Before: Garry, P.J., Egan Jr., Pritzker, Lynch and Fisher, JJ.

Letitia James, Attorney General, Buffalo (Sarah L. Rosenbluth of counsel), for State of New York and another, appellants.
Hodgson Russ LLP, Albany (Christopher Massaroni of counsel), for Assembly of the State of New York and others, appellants.
Elias Law Group LLP, Washington, DC (Justin Baxenberg of counsel, admitted pro hac vice) and Dreyer Boyajian LLP, Albany (James R. Peluso of counsel), for Democratic Congressional Campaign Committee and others, appellants.
Hacker Murphy LLP, Troy (James Knox of counsel), for Senate of the State of New York and another, appellants.
Fusco Law Office, Albany (Adam Fusco of counsel) and Perillo Hill LLP, Sayville (John Ciampoli of counsel), for Rich Amedure and others, respondents.
DerOhannesian & DerOhannesian, Albany (Paul DerOhannesian II of counsel), for Minority Leader of the Senate of the State of New York and another, respondents.
Brian L. Quail, Albany, for Democratic Commissioners of the Board of Elections, respondents.

Garry, P.J.
Appeal from a judgment of the Supreme Court (Rebecca A. Slezak, J.), entered May 8, 2024 in Saratoga County, which partially granted petitioners' application, in a combined proceeding pursuant to Election Law article 16 and CPLR article 78 and action for declaratory judgment, to, among other things, declare that Laws of 2021, chapter 763 is unconstitutional.
As a result of the COVID-19 pandemic, there was a vast increase in the number of absentee ballots requested and returned in the 2020 general election, resulting in significant delays in tabulating the election results for multiple races (see Senate Introducer's Mem in Support, Bill Jacket, L 2021, ch 763 at 8). In anticipation of large numbers of voters again using absentee ballots in 2021 (see L 2020, ch 139), the Legislature enacted Laws of 2021, chapter 763, overhauling the canvass process contained in Election Law § 9-209 "in order to obtain the results of an election in a more expedited manner and to [en]sure that every valid vote by a qualified voter is counted" (Senate Introducer's Mem in Support, Bill Jacket, L 2021, ch 763 at 7). Election Law § 9-209, in its current form, implements a new process defining the manner "to review, cast and canvass early mail, any absentee, military, special presidential, special federal or other special ballots and any ballots cast in affidavit envelopes" (hereinafter collectively referred to as the paper ballots). On the eve of the 2022 general election, most of the same petitioners here — including the New York State Republican Party, the New York State Conservative Party and the Saratoga County Republican Party — sought to have Laws of 2021, chapter 763 declared unconstitutional on numerous grounds (Matter of Amedure v State of New York, 210 AD3d 1134, 1134-1135 [3d Dept 2022]). This Court concluded that the requested relief was barred by the doctrine of laches (id. at 1136-1139).
In the current hybrid proceeding, the challenge has distilled to Election Law § 9-209 (2) (g), which, in effect, requires disputes as to the validity of the signature on a ballot envelope to be resolved in favor of the voter. Following joinder of issue, Supreme Court agreed with petitioners that, by requiring the casting and canvassing of a ballot in the face of such disagreement, the section violates the equal representation mandate contained in NY Constitution, article II, § 8 and usurps the power of the judiciary to determine election law disputes. The court elected to sever Election Law § 9-209 (2) (g) and declare the remainder of Laws of 2021, chapter 763 to be constitutional and valid. Respondents State of New York, Senate of the State of New York, Majority Leader and President Pro Tempore of the Senate of the State of New York, Assembly of the State of New York, Speaker of the Assembly of the State of New York, Majority Leader of the Assembly of the State of New York, Democratic Congressional Campaign Committee, Senator Kirsten Gillibrand, Representative Paul Tonko [*2]and Declan Taintor appeal.
As many of the respondents assert, the issue posed is narrow. In light of the very broad arguments presented in response by petitioners upon this appeal, we begin our analysis by emphasizing that Election Law § 9-209 (2) (g) exists in the context of all the procedural safeguards that come before it and the totality of the judicial oversight authorized by law. The multiple steps and protections built into the election process, and within this statutory scheme, thus bear noting and describing, as they address these broad concerns by careful design.
Initially, in accordance with the mandates of NY Constitution, article II, § 1, no person is entitled to vote in any election in this state unless they are both qualified (see Election Law §§ 5-102, 5-106) and registered (see Election Law § 5-100), and any person who applies for registration who is suspected to not be so qualified may be challenged by any qualified voter, watcher or inspector of election (see Election Law § 5-218). Lists of registered voters, and party enrollment, are published for public review (see Election Law §§ 5-602, 5-604), and challenges may also be brought to cancel a completed registration (see Election Law § 5-220). Registration applications and registration challenges are reviewed by bipartisan entities (see Election Law §§ 5-202 [2]; 5-702 [1]), and there are criminal consequences for, among other malfeasance, false registrations (see Election Law §§ 5-702 [8]; 17-104, 17-108), a variety of manners of illegal voting (see Election Law §§ 17-102 [1]; 17-132) and knowingly and willfully permitting an individual to vote who was not entitled to do so (see Election Law § 17-130 [2]; see also Election Law §§ 17-102 [10], [12]; 17-106). There are also a number of systematic checks in place to guard against fraudulent practices. For example, various governmental entities are charged with delivering the names of persons that should be removed from lists of registered voters, including those for whom death certificates have been issued, those who have lost voting privileges and those who have been adjudicated incompetent (see Election Law § 5-708 [1]-[3]; see also Election Law § 5-708 [7]). Changes of address are routinely monitored (see Election Law §§ 4-117, 5-704; 5-708 [5], [6]; 5-712 [5]), and the Election Law goes so far as to authorize a special door-to-door check of all registered voters in an election district (see Election Law § 5-710 [1]).
With respect to both absentee and early mail voting specifically, there is again investigation into whether the applicant is qualified to vote and to receive an absentee or early mail ballot (see Election Law §§ 8-402 [1]; 8-702 [1]; see also Election Law § 8-400 [3]). Upon request by any qualified voter, a board of elections must make available for inspection a complete list of all applicants to whom absentee or early mail ballots have been delivered or mailed (see Election Law §§ 8-402 [7]; 8-702 [4]). Before [*3]a vote is cast at an election, any person may be challenged as to his or her right to vote absentee (see Election Law §§ 8-502, 8-506 [1]). Electronic absentee and early mail ballot tracking systems are also in place to ensure, among other things, that a qualified voter may cast only one vote (see Election Law §§ 8-414; 8-712). There are, notably, specific felonies designed to punish abuses of the absentee and early mail voting process (see Election Law § 17-132 [3], [7], [8]).
Turning to the statutory canvass procedure, which "contain[s] substantial protections to ensure election integrity" (Stefanik v Hochul, 229 AD3d 79, ___, 211 NYS3d 574, 576 [3d Dept 2024], affd ___ NY3d ___, 2024 NY Slip Op 04236, *3 [Aug. 20, 2024]), each local board of elections is required to designate one or more sets of poll clerks to review early mail, absentee, military and special ballot envelopes (see Election Law § 9-209 [1]). Each set of poll clerks, referred to as a central board of canvassers, "shall be divided equally between representatives of the two major political parties" (Election Law § 9-209 [1]; see also Election Law § 3-400 [3]). The first step in the actual review process is for the central board of canvassers to "examine the ballot affirmation envelopes" (Election Law § 9-209 [2]). Where "a person whose name is on a ballot envelope as a voter is not on a registration poll record, the computer-generated list of registered voters or the list of special presidential voters, or if there is no name on the ballot envelope, or if the ballot envelope was not timely postmarked or received, or if the ballot is completely unsealed, such ballot envelope shall be set aside unopened for [postelection] review pursuant to [Election Law § 9-209 (8)] . . . notwithstanding a split among the central board of canvassers as to the invalidity of the ballot" (Election Law § 9-209 [2] [a]). Certain defects on the ballot envelope are "curable" (Election Law § 9-209 [3] [a]), including the lack of a signature and a signature that does not correspond to that voter's registration signature (see Election Law § 9-209 [3] [b]). Upon a bipartisan determination that any of the curable conditions have occurred, voters are provided an opportunity to correct such defect(s) by filing a duly signed affirmation — an additional safeguard — and, if cured, the initially rejected ballot shall be reinstated and prepared for canvassing (see Election Law § 9-209 [3] [d], [e]; see also 9 NYCRR 6210.21 [b] [1]). If not appropriately cured, these ballots are set aside for review under Election Law 9-209 (8) (see Election Law § 9-209 [3] [f]).
After a person whose name is on a ballot envelope "is found to be registered," the next step requires a comparison of the signature on the ballot envelope with the signature on the registration poll record, or other applicable voters list, of the person of the same name who registered from the same address (Election Law § 9-209 [2] [c]). Where "the signatures [*4]are found to correspond" (Election Law § 9-209 [2] [c]) and "such person is found to be registered and has requested a ballot, the ballot envelope shall be opened, the ballot . . . withdrawn, unfolded, stacked face down and deposited in a secure ballot box or envelope" (Election Law § 9-209 [2] [d]).[FN1]
The core of this dispute, Election Law § 9-209 (2) (g), provides that, "[i]f the central board of canvassers splits as to whether a ballot is valid, it shall prepare such ballot to be cast and canvassed pursuant to [Election Law § 9-209 (2)]." This directive necessarily does not apply to registration flaws, as the statute mandates that ballots with such flaws, among others, be set aside for postelection review (see Election Law § 9-209 [2] [a]). Thus, Election Law § 9-209 (2) (g) mainly concerns a disagreement as to a voter's signature match. Put another way, having delineated a statutory review process in which the voter has already been deemed to be qualified, properly registered and entitled to vote, the Legislature has determined that a disagreement between partisan representatives as to whether that voter's signature on the ballot envelope matches the signature(s) on file should not stop the canvassing of the ballot. As the Attorney General has put it, the tie goes to the voter. There is a strong basis in policy and history supporting this result.[FN2]

Election Law § 9-209 (8) requires postelection review of all ballot envelopes set aside under Election Law § 9-209 (2) and (3) within four business days of the election, on notice to each candidate, political party and independent body entitled to have had watchers present at the polls (see Election Law § 9-209 [8] [a], [b]). At that time, "each central board of canvassers shall review the ballot envelopes determined to be invalid and set aside . . . , ballot envelopes that were returned as undeliverable, and ballot envelopes containing one or more curable defects that have not been timely cured" (Election Law § 9-209 [8] [d]), and each affected candidate, political party and independent body "shall be entitled to object to the board of elections' determination that a ballot is invalid" (Election Law § 9-209 [8] [e]). To effectuate the foregoing process, Election Law § 9-209 (8) (e) directs that ballots determined to be invalid "shall not be counted absent an order of the court" and "[i]n no event may a court order a ballot that has been counted to be uncounted." Election Law § 16-106 (1) provides a statutory procedure to commence a proceeding to challenge a postelection refusal to cast any of the paper ballots.
Against this backdrop, petitioners first argue that Election Law § 9-209 (2) (g) effectively permits one partisan election official to validate a ballot, and the statute therefore facially violates the equal representation required by NY Constitution, article II, § 8. "It is well settled that legislative enactments are entitled to a strong presumption of constitutionality, and courts strike [*5]them down only as a last unavoidable result after every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible. Thus, while the presumption of constitutionality is not irrefutable, as the part[ies] challenging a duly enacted statute," petitioners carry a heavy burden and must demonstrate the invalidity of Election Law § 9-209 (2) (g) "beyond a reasonable doubt" (White v Cuomo, 38 NY3d 209, 216 [2022] [internal quotation marks and citations omitted]; see Stefanik v Hochul, ___ NY3d ___, ___, 2024 NY Slip Op 04236, *3 [Aug. 20, 2024]). Additionally, "[i]n the construction of constitutional provisions, the language used, if plain and precise, should be given its full effect"; "it must be presumed that its framers understood the force of the language used and, as well, the people who adopted it," and there is no place for "interstitial and interpretative gloss . . . that substantially alters the specified law-making regimen" (Matter of Harkenrider v Hochul, 38 NY3d 494, 511 [2022] [internal quotation marks, brackets and citations omitted]).
NY Constitution, article II, § 8 provides that "[a]ll laws creating, regulating or affecting boards or officers charged with the duty of qualifying voters, or of distributing ballots to voters, or of receiving, recording or counting votes at elections, shall secure equal representation of the two political parties which, at the general election next preceding that for which such boards or officers are to serve, cast the highest and the next highest number of votes." Contrary to Supreme Court's conclusion, there is no justification for departing from this literal language to hold that "equal representation" must mean "bipartisan action" when counting votes — i.e., that representatives of the two political parties must be forced to agree as to the authenticity of the signature on a ballot envelope duly issued to a qualified, registered voter for that ballot to be counted. All that the Constitution requires in this respect is "equality of representation to the two majority political parties on all such boards and nothing more" (People ex rel. Chadbourne v Voorhis, 236 NY 437, 446 [1923] [emphasis added]). With respect to canvassing paper ballots, that mandate is clearly satisfied by Election Law § 9-209 (1). The cases upon which petitioners and Supreme Court rely concern a statutory provision that has no bearing on what the language of the Constitution itself requires (see Election Law § 3-212 [2]).
It must also be emphasized that Election Law § 9-209 (2) (g) does not go beyond those matters that are within the constitutional power of the Legislature to control. Courts have long recognized the power of the Legislature to prescribe the method of conducting elections, including the manner in which qualified voters may vote and for the return and canvass of their votes (see NY Const, art II, §§ 2, 7; Stefanik v Hochul, 2024 NY Slip Op 04236 [*6]at *3, *9; Matter of Gross v Albany County Bd. of Elections, 3 NY3d 251, 258 [2004]; Matter of Davis v Board of Elections of City of N.Y., 5 NY2d 66, 69 [1958]). Specifically, that constitutional authority derives from NY Constitution, article II, § 7, titled "[m]anner of voting; identification of voters," which provides, in pertinent part, that "[a]ll elections by the citizens, except for such town officers as may by law be directed to be otherwise chosen, shall be by ballot, or by such other method as may be prescribed by law, provided that secrecy in voting be preserved." NY Constitution, article II, § 2 provides further authority with respect to absentee ballots, specifying that "[t]he legislature may, by general law, provide a manner in which, and the time and place at which, qualified voters . . . may vote and for the return and canvass of their votes." Rather than violating the Constitution, the Legislature has set forth a detailed canvass procedure that both preserves secrecy in voting and refrains from "disenfranchis[ing] constitutionally qualified electors" (Matter of Hopper v Britt, 203 NY 144, 150 [1911]; see NY Const, art I, § 1; art II, § 7; Matter of Davis v Board of Elections of City of N.Y., 5 NY2d at 68-69).
Petitioners' argument that Election Law § 9-209 (2) (g) unconstitutionally usurps the role of the judiciary in resolving election disputes must also be rejected. It is well established that "[a]ny action Supreme Court takes with respect to a general election challenge 'must find authorization and support in the express provisions of the Election Law statute' " (Matter of Delgado v Sunderland, 97 NY2d 420, 423 [2002] [brackets omitted], quoting Schieffelin v Komfort, 212 NY 520, 535 [1914]; see Matter of Hughes v Delaware County Bd. of Elections, 217 AD3d 1250, 1256 [3d Dept 2023]). Although Supreme Court enjoys "general original jurisdiction in law and equity" (NY Const, art VI, § 7 [a]), this statutory limitation on judicial review falls within the Legislature's constitutional authority over the process for canvassing paper ballots (see NY Const, art II, §§ 2, 7).
As described above, when a central board of canvassers cannot agree, in the final steps of canvassing votes, regarding the validity of a signature, a presumption of validity applies in favor of the voter, the ballot is canvassed and a court may no longer order the ballot uncounted (see Election Law § 9-209 [2] [g]; [8] [e]; Senate Introducer's Mem in Support, Bill Jacket, L 2021, ch 763 at 9). Nonetheless, the judiciary still plays a significant role in the adjudication of election disputes (see generally Election Law § 16-100). As stated above, voters and candidates may seek judicial review of a central board of canvassers' refusal to cast ballots (see Election Law §§ 9-209 [8] [e]; 16-106 [1]). A voter may contest the canvass of returns (see Election Law § 16-106 [2]), and the court may direct a recanvass or "correction of an error" (Election Law § 16-106 [4]). [*7]Watchers are still permitted to be present at the polls and may observe the review of ballot envelopes (see Election Law §§ 8-500, 9-209 [5]), and candidates may obtain temporary or preliminary injunctive relief from a court in the event that "procedural irregularities or other facts arising during the election suggest a change or altering of the canvass schedule . . . may be warranted" (Election Law § 16-106 [5]). The judiciary also continues to have authority over disputes regarding voter registration and enrollment (see Election Law §§ 16-108, 16-110), as well as party nominations (see Election Law § 16-102), the form and content of any ballot (see Election Law § 16-104) and the location of polling places (see Election Law § 16-115), among other things. Additionally, although the acceptance of a ballot signature may be fairly characterized as the ultimate determination of that ballot's validity, the judiciary has jurisdiction over actions challenging the results and contesting title to the public office of the purported winner of an election (see Executive Law § 63-b; Matter of Delgado, 97 NY2d at 423-424).
If the foregoing express authorizations — along with the criminal justice system — are not enough to safeguard against the concerns set forth by petitioners, "even when proscribed by statute, judicial review is mandated when constitutional rights are implicated by an administrative decision or 'when the agency has acted illegally, unconstitutionally, or in excess of its jurisdiction' " (Matter of De Guzman v State of N.Y. Civ. Serv. Commn., 129 AD3d 1189, 1190-1191 [3d Dept 2015], lv denied 26 NY3d 913 [2015], quoting Matter of New York City Dept. of Envtl. Protection v New York City Civ. Serv. Commn., 78 NY2d 318, 323 [1991]). Again, petitioners carry a heavy burden to demonstrate unconstitutionality beyond a reasonable doubt (see Stefanik v Hochul, 2024 NY Slip Op 04236 at *3). In our view, the legislative decision to preclude judicial challenges to timely-received, sealed ballots duly issued to qualified, registered voters found to be authentic by at least one election official — in order to ensure all valid votes are counted, with the proliferation of absentee and early mail voting — does not unconstitutionally intrude upon the judiciary's powers (see NY Const, art VI, § 30).
For the foregoing reasons, we find that petitioners have failed to establish that Election Law § 9-209 (2) (g) is in conflict with the NY Constitution. We therefore declare the whole of Laws of 2021, chapter 763 to be constitutional and valid.
Lynch and Fisher, JJ., concur.
Egan Jr., J. (dissenting).
We have no quarrel with facilitating the right and privilege of all New Yorkers to vote, and commend the Legislature for amending the Election Law in 2021 in a manner that does so. We do take issue with one provision in that worthy legislation which, in our opinion, has the potential to inhibit the rights of New Yorkers to cast their ballot by preventing objections [*8]to a ballot cast by someone else in their name.
The NY Constitution and the Election Law require that representatives of both major parties are involved in assessing challenges to the qualifications of a prospective voter and the validity of his or her ballot. Election Law § 9-209 (2) (g), as recently amended, upended the longstanding expectation that there would be bipartisan agreement — and not just consultation — in resolving certain challenges to absentee ballots, creating a presumption that the ballot is valid even if there is dispute between election officials as to whether, most importantly, the signature on the ballot envelope matches that of the person who purportedly cast it. The ballot is then counted in a way that prevents any possibility of judicial review to resolve those concerns. The sole issue presented on this appeal is whether Election Law § 9-209 (2) (g) offends the NY Constitution and, because we conclude that it does, we respectfully dissent.
Prior to the 2021 amendments, any envelopes containing absentee, military and special ballots received by a board of elections would be held unopened until after an election, when a meeting would be held for their examination by a board of inspectors "divided equally between representatives of the two major political parties" (Election Law former § 9-209 [1] [a]). Watchers representing candidates, political parties and others were entitled to attend that meeting and object to an unopened ballot envelope on grounds that included a purported voter's lack of entitlement to cast a ballot — due to, for instance, the purported voter not being registered to vote, having already voted in person or having already mailed in a ballot — and problems with the ballot envelope (see Election Law former § 9-209 [1] [c]; [2]). The bipartisan board of inspectors would review each ballot and rule on its validity. If the board of inspectors agreed that an objection had merit, the board would reject the ballot if there was a noncurable defect or give the purported voter an opportunity to correct any curable defect. If the board could not reach bipartisan agreement as to the validity of the ballot, or could not agree as to whether the attempts to cure any defect were adequate, the ballot would be set aside unopened for three days and would thereafter be "counted unless otherwise directed by an order of the court" (Election Law former § 9-209 [2] [d]; [3] [c]). The statutory process therefore contemplated bipartisan action by the board of inspectors to resolve any objection to a ballot and, if there was not bipartisan agreement as to the ballot's validity, there would be an opportunity for judicial review to resolve the challenge.
In 2021, the Legislature rewrote Election Law § 9-209 with the admirable goals in mind of speeding up review of absentee and other mail-in ballots so that election results could be reported sooner and that the enfranchisement of voters would be encouraged by reducing the number of [*9]meritless, partisan challenges to their ballots. The majority details the process contemplated by the new statute, but, briefly, the statute generally directs that a panel of election officials, equally divided between the two major parties, conduct a rolling review of ballot envelopes as they come in (see Election Law § 9-209 [1]-[3]). Certain defects render the ballot envelope conclusively invalid and result in its rejection (see Election Law § 9-209 [2] [b]). Other defects, such as the lack of a registered voter's name on the ballot envelope, an envelope with no name at all on it or an envelope that was unsealed or that was not sent or received in a timely manner, result in the envelope and enclosed ballot being set aside for postelection review even if the reviewing officials disagree on whether the envelope (or the ballot therein) is invalid (see Election Law § 9-209 [2] [a]). The ensuing review has some similarities to the one required under the pre-2021 version of Election Law § 9-209, affording interested parties an opportunity to witness the review and raise objections. If election officials ultimately agree that the ballot is invalid, objectors are then afforded a window of time to seek judicial review (see Election Law § 9-209 [8] [e]). No such right is granted if the ballot is deemed valid and, indeed, the Legislature has made clear that courts are barred from ordering that a ballot be "uncounted" which has already been found valid and counted (Election Law § 9-209 [8] [e]; see Election Law § 16-106 [1], as amended by L 2021, ch 763, § 5).
So far, so good. The above changes go far in achieving the legislative aims of speeding up the vote counting process while protecting an individual's right to vote from meritless attack, and they are not at issue. The problem here occurs in the limited circumstance where there is ultimately disagreement between the reviewing officials as to whether an absentee ballot is valid. Objections to those ballots can be quite serious and include, as the State concedes, whether the purported voter is actually the person trying to vote given discrepancies between the signature on the ballot envelope and the voter's actual signature on file, whether the voter is qualified to vote, and whether the voter cured a defective ballot envelope after having been given an opportunity to do so (see Election Law § 9-209 [2] [c], [g]; [3] [e]). If such a defect is observed by one of the officials and there is a "split[ ] as to whether a ballot is valid, [the officials] shall prepare such ballot to be cast and canvassed pursuant to this subdivision" (Election Law § 9-209 [2] [g]). The language of section 9-209 (2) (g) is less than transparent as to what the effect is of the ballot being cast and canvassed in the event of a deadlock. As noted above, however, the amended language of Election Law § 16-106 leaves no question that no one, even the voter who purportedly prepared and sent in the ballot, can pursue an objection to the [*10]ballot in court because it will have already been counted. It is section 9-209 (2) (g) — and, for all of the majority's discussion of other areas of the Election Law, only that provision — that is at issue here. There is no question that the provision is invalid.
Section 8 of article II of the NY Constitution provides that "[a]ll laws creating, regulating or affecting boards or officers charged with the duty of qualifying voters, or of distributing ballots to voters, or of receiving, recording or counting votes at elections, shall secure equal representation of the two political parties which, at the general election next preceding that for which such boards or officers are to serve, cast the highest and the next highest number of votes." This provision was first adopted in 1894, albeit as a different section of article II, to reflect the reality "that New York is under party government" and that it was preferable to have "election machinery . . . constructed as to insure equal party advantage, so far as concerned the conduct and result of an election, [so] that one party should not, by the use of election machinery, obtain any advantage over its opponents" (3 Charles Z. Lincoln, The Constitutional History of New York 115 [1905]). In other words, the NY Constitution requires a balance of power between the two major parties in applying the Election Law so that the parties act as a check on each other and ensure that neither will game the system in a manner that endangers the right of individuals to vote in a fair election (see Matter of Graziano v County of Albany, 3 NY3d 475, 480 [2004]). As has been recognized, when this constitutionally-mandated, "even-handed application of the Election Law and . . . bipartisan balance is not maintained, the public interest is affected" given the negative impact unchecked partisanship could have on elections and the ability of individuals to vote in them (id. at 481).
The parties challenging Supreme Court's judgment and supporting the constitutionality of the statute point out, and rightly so, that article II, § 8 does not explicitly require bipartisan agreement for election officials to take action in that its language "guarantee[s] equality of representation to the two majority political parties on all [election] boards and nothing more" (People ex rel. Chadbourne v Voorhis, 236 NY 437, 446 [1923]). The requirement of bipartisan agreement necessarily flows from that guarantee of equal representation, however, because a tie vote in an equally divided body results in a lack of authorization to take any action "under the common law [and] the parliamentary law" (Felice v Swezey, 278 App Div 958, 959 [2d Dept 1951]; see also People ex rel. Argus Co. v Bresler, 171 NY 302, 309 [1902]; Henry M. Robert, Pocket Manual of Rules of Order for Deliberative Assemblies § 38 [1877]). The framers of article II, § 8 understood that reality; indeed, one delegate to the convention where the provision was drafted complained that [*11]creating a "double-headed" system of equal representation in election matters would "leave[ ] no place where the matter can be decided in the event of a discussion and difference of opinion as between parties," affording "absolutely no power of decision" in the event of a split between election officials (3 Charles Z. Lincoln, The Constitutional History of New York 129 [1905]). The provision was adopted despite the drafters' awareness that it would require a bipartisan agreement to take action, which is suggestive in "determin[ing] the construction to be placed on [that] section of the Constitution" (McKinney's Cons Laws of NY, Book 1, Statutes § 125, Comment; see American Airlines v State Commn. for Human Rights, 29 AD2d 178, 181 [1st Dept 1968]). The Legislature itself has also traditionally hewed to that reading and, for that matter, still does where Election Law § 9-209 is not involved. Indeed, Election Law § 3-212 (2) generally requires that actions by a local board of elections "shall require a majority vote of the commissioners prescribed by law for such board," while Election Law § 3-200 imposes a similar requirement for actions by the State Board of Elections. In short, the language and history of article II, § 8 of the NY Constitution leave no doubt that it requires a bipartisan majority for election officials to act, and the Legislature has apparently agreed with that reading given its expression of an "intent . . . for bipartisan conduct by [b]oards of [e]lections" which is "paramount" (Matter of Conlin v Kisiel, 35 AD2d 423, 425 [4th Dept 1971], affd on op below 28 NY2d 700 [1971])
Article II, § 8 of the NY Constitution therefore requires bipartisan agreement if election officials are required to decide whether a challenged ballot is valid, and Election Law § 9-209 (2) (g) conflicts with that requirement by creating a presumption that a challenged ballot is valid in the event of a deadlock. Since deadlocked election officials cannot resolve the objection one way or the other, the objection remains outstanding, and there can be no presumption that the ballot is valid. Even accepting that the appealing parties are correct in arguing that a party objecting to the validity of a ballot is not entitled as a constitutional matter to judicial review in the event of a deadlock, the fact remains that the Legislature could easily correct the infirmity in section 9-209 (2) (g) by authorizing judicial review in the event of a deadlock, directing that a challenged ballot be held for a period of time and counted unless the undecided objection is pursued in a proceeding under Election Law article 16 that would permit a court to resolve the issue and render a determination. The Legislature has not done so, however, and the presumption created by Election Law § 9-209 (2) (g) cannot stand as it is currently drafted. Thus, we would affirm the judgment of Supreme Court in its entirety.
Pritzker, J., concurs.
ORDERED that the judgment is modified, on [*12]the law, without costs, by reversing so much thereof as declared Election Law § 9-209 (2) (g) unconstitutional; petition/complaint dismissed, and it is declared that Laws of 2021, chapter 763 is constitutional and valid; and, as so modified, affirmed.

Footnotes

Footnote 1: It is important to note that this is only the statutory procedure and that the regulations of the State Board of Elections offer extensive additional direction. This includes standards and procedures for comparing signatures, which contemplate yet additional levels of bipartisan signature review in certain circumstances (see 9 NYCRR 6210.21 [h] [2]).

Footnote 2:As the Court of Appeals has recognized, "[t]he right of suffrage is one of the most valuable and sacred rights which the Constitution has conferred upon the citizen of the state," and "it would be a far greater menace to the security of this constitutional right . . . if the law regulating its exercise might prevent the vote of a citizen, duly qualified to cast it, from being received and counted, than that some fraud might be practiced by a false personation" (People ex rel. Stapleton v Bell, 119 NY 175, 178-179 [1890]). "[I]n the one case, there would be the disenfranchisement of the elector; while, in the other, for the wrong done to the people, or to the individual, penalties and remedies are provided, and tribunals exist for their enforcement against a wrongdoer and for the establishment of the right" (id. at 179).