Matter of Amedure v State of New York (2024 NY Slip Op 05425)

Matter of Amedure v State of New York

2024 NY Slip Op 05425

Decided on October 31, 2024

Court of Appeals

Per Curiam

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on October 31, 2024

No. 126 

[*1]In the Matter of Rich Amedure, et al., Appellants,
v
State of New York, et al., Respondents, Minority Leader of the Senate of the State of New York et al., Appellants, et al., Respondent.

Adam M. Fusco, for appellants Rich Amedure, et al.
Paul DerOhannesian, II, for appellants Minority Leader of the Senate of the State of New York et al.
Sarah L. Rosenbluth, for respondent State of New York
Benjamin F. Neidl, for respondents Senate of the State of New York et al.
Christopher Massaroni, for respondents Assembly of the State of New York, et al.

PER CURIAM:

In 2021, the Legislature enacted chapter 763 of the Laws of 2021 to streamline the canvassing of certain ballots. One of its provisions, Election Law § 9-209 (2) (g), provides that if the members of a bipartisan local board charged with reviewing ballots are split as to a ballot's validity, the ballot shall be cast and canvassed. Petitioners/plaintiffs (hereinafter plaintiffs) claim this section violates the equal representation mandate set forth in article II, section 8 of the New York Constitution and constitutional principles of judicial review and separation of powers. Seeing no merit to these challenges, we affirm the order of the Appellate Division. We also dismiss the appeal taken therefrom by the Minority Leaders of the Senate and the Assembly.
I.
The Election Law sets forth instructions for reviewing and canvassing absentee, mail-in, and certain other ballots (see Election Law § 9-209). During the 2020 election, there was an unusually high volume of absentee ballots due to the COVID-19 pandemic, and the statutorily mandated procedures gave rise to significant delays in the state's election reporting (see Senate Introducer's Mem in Support, Bill Jacket, L 2021, ch 763 at 8). Following that [*2]election, the Legislature enacted chapter 763, which repealed and replaced Election Law § 9-209. The prior statute had provided that a "central board of inspectors" would review absentee and other special ballots "no more than fourteen days after a general or special election and no more than eight days after a primary election" (see former Election Law § 9-209 [1] [a] et seq. [detailing the previous canvass process]). By enacting chapter 763, the Legislature sought to address the delays by requiring the review of absentee ballots every four days once early voting begins, and once every day on or after the election (see Election Law § 9-209 [2]; Governor's Approval Mem, Bill Jacket, L 2021, ch 763 at 6 ["These three election bills . . . speed up the counting of absentee ballots, make them more accessible, and permit New Yorkers who have requested a ballot to track its progress"]; Senate Introducer's Mem in Support, Bill Jacket, L 2021, ch 763 at 7 ["This bill amends the Election Law . . . in order to obtain the results of an election in a more expedited manner and to assure that every valid vote by a qualified voter is counted"]).
As relevant here, before returning one of the covered ballots a voter must place their completed ballot inside a ballot affirmation envelope (ballot envelope) (see e.g. Election Law §§ 7-119, 7-122, 7-125, 8-302 [3] [e] [ii]). The voter must then sign the ballot envelope, place it inside a return envelope, and mail that envelope or return it in person. When the local board of elections receives that envelope, it is reviewed for potential defects, some of which the statute deems incurable and others curable. The local board of elections or a set of poll clerks known as the "central board of canvassers" (the Board) is entrusted with that process (id. § 9-209 [1]). The statute requires that each Board "be divided equally between representatives of the two major political parties," a mandate included in the prior version of the law as well (id.; see Election Law former § 9-209 [1] [a]). The Board is thus required to have an even number of members and may have as few as two.
Under subdivision (2) (a), the Board first reviews the ballot envelope for any of four incurable defects that would render it presumptively invalid: (1) the name on the ballot envelope does not match the registration records; (2) there is no name on the ballot envelope; (3) the ballot envelope was not timely received or the postmark is not timely; or (4) the ballot envelope is completely unsealed. If the Board concludes that a ballot has any of these defects or splits as to the existence of any defect, then the ballot must be set aside for post-election review pursuant to section 9-209 (8) (see Election Law § 9-209 [2] [a]). If none of these defects exist, the Board then reviews the ballot for conditions that may render it defective but curable. Those conditions are set forth in Election Law § 9-209 (3) (b).
The appeal before us primarily concerns the process through which the Board evaluates one of these conditions: whether the voter's signature on the ballot envelope matches the voter's signature on file [FN1]. Election Law § 9-209 (2) (c) requires that the Board "compare the signature, if any, on each ballot envelope" with the signature on the applicable registration records. A non-matching signature renders a ballot defective, but curable (id. § 9-209 [3] [b]). Election Law § 9-209 (2) (g) provides that if the Board splits "as to whether a ballot is valid," it "shall prepare such ballot to be cast and canvassed pursuant to this subdivision." Thus, at the time, for example, that a two-person Board reviews a ballot for a signature match, subdivision (2) (g) allows either of the canvassers to approve the ballot for canvassing, and at that point the ballot envelope will be opened and the ballot processed pursuant to subdivision (2) (d). Once a ballot is processed, subdivision (8) (e) prohibits "a court [from] order[ing] a ballot that has been counted to be uncounted" (Election Law § 9-209 [8] [e]).
We turn now to the dispute before us. Plaintiffs filed this proceeding/action against defendants the State of New York, the New York Senate and Assembly, the Senate and Assembly Majority Leaders, and the Senate and Assembly Minority Leaders, seeking a declaration that chapter 763 is unconstitutional in its entirety. Plaintiffs argued that Election Law § 9-209 (2) (g) violated the equal representation mandate in article II, section 8 of the New York Constitution and principles of judicial review, and that these defects were not severable from the rest of the law. Most of the defendants filed motions to dismiss, except the Minority Leaders, who filed a Memorandum of Law in support of plaintiffs' claims but sought no relief of their own.
Supreme Court concluded that subdivision (2) (g) violated article II, section 8 of the New York Constitution and improperly restricted judicial review in violation of the New York Constitution, but found that provision [*3]severable and declared the remainder of the statute constitutional. Only certain defendants/respondents appealed (but not the Minority Leaders), and a divided panel of the Appellate Division reversed (— AD3d —, 2024 NY Slip Op 04295 [3d Dept 2024]). The Appellate Division reasoned that the plain language of article II, section 8 required "equal representation" of both parties on the Boards, that Election Law § 9-209 (1) satisfied this mandate, and that subdivision (2) (g) did not unconstitutionally constrain the judiciary (id. at *4-6). Two Justices dissented. Plaintiffs, and separately, the Minority Leaders, appeal as of right.
II.
It is well-settled that "[l]egislative enactments are entitled to a strong presumption of constitutionality" (Stefanik v Hochul, — NY3d —, —, 2024 NY Slip Op 04236, *3 [2024], quoting White v Cuomo, 38 NY3d 209, 216 [2022]). Thus, plaintiffs must meet a "heavy burden" to prevail on their challenge to subdivision (2) (g) (People v Foley, 94 NY2d 668, 677 [2000]). Ultimately, plaintiffs' reading is inconsistent with the constitutional framework.
Plaintiffs argue that Election Law § 9-209 (2) (g) violates article II, section 8 of the New York Constitution by allowing a ballot to be processed as valid where the Board evenly splits as to its validity. Section 8 provides that
"[a]ll laws creating, regulating or affecting boards or officers charged with the duty of qualifying voters, . . . or of receiving, recording or counting votes at elections, shall secure equal representation of the two political parties which, at the general election next preceding that for which such boards or officers are to serve, cast the highest and next highest number of votes." (NY Const, art II, § 8).
According to plaintiffs, Election Law § 9-209 (2) (g) violates this equal representation mandate because equal representation requires bipartisan agreement. We disagree.
Plaintiffs' argument fails under the plain text of article II, section 8. The provision requires "equal representation" of the two major political parties on various election bodies, and Election Law § 9-209's requirement that the Board be "divided equally between representatives of the two major political parties" secures that equal representation (Election Law § 9-209 [1]). Critically, the authority that Election Law § 9-209 vests in a two-member Board is equally distributed to each member: during the Board's initial review for defects, either member can declare a ballot invalid (see id. § 9-209 [2] [a]), and during the Board's subsequent review, either member can declare a ballot valid (see id. § 9-209 [2] [g]). Thus, no single Board member has any more authority than any other member over the canvassing process, and neither party carries more sway over the process than the other.
Although we need go no further, the history of article II, section 8 confirms our reading. Adopted at the 1894 constitutional convention, the provision was originally introduced to constitutionalize a statutory equal representation mandate that had been enacted several years earlier (see Peter J. Galie & Christopher Bopst, The New York State Constitution 109 [2d ed 2012]; 3 Charles Z. Lincoln, The Constitutional History of New York 127-129 [1906] [noting that the sponsor of the original draft claimed that "bi-partisan boards of elections should be provided for," and the bipartisanship should be secured "in perpetuity to the people of the state"]; see also id. at 114-127 [providing an extended discussion of the historical precedents]).
Discussion of this provision at the convention, though not extensive, reflects an understanding that bipartisan unanimity was not required for election boards to take action. Its sponsor stated that the amendment was intended to "secure purity" and "absolute impartiality in the conduct of elections" (Galie & Bopst at 109 [quoting statement of Edward Lauterbach]), and that it did so by "engraft[ing] into the Constitution of the State the policy that the casting of the votes and the counting of the ballots shall be under the supervision of the representatives of both parties" (3 Rev Rec, 1894 Constitutional Convention at 251 [comment of Lauterbach]). Subdivision (2) (g) permits the review of absentee ballots to occur under exactly that arrangement.
As the Appellate Division dissent notes, one delegate complained that the equal representation mandate would be "fatal to our system of government, because it leaves no place where the matter can be decided in the event of a discussion, [and] a difference of opinion, as between parties" and would appoint no one to break a tie (3 Rev Rec, 1894 Constitutional Convention at 248 [comment of Dean], 254 [comment from another delegate asking how a validity determination would be made in the event of a tie and proposing that the majority party have power to [*4]decide]; see also 3 Lincoln at 129; 3 Rev Rec, 1894 Constitutional Convention at 243-271 [general discussion]). In our view, the dissent misreads this isolated comment by a dissenting voice as assuming that bipartisan agreement was required to take action, rather than as expressing concern about the lack of a unanimity requirement. Indeed, in response to questions about what would happen in the event of a tie vote (3 Rev Rec, 1894 Constitutional Convention at 254 [comments of Woodward, Johnson]), another delegate explained that, under the existing legal framework, when an in-person vote was contested by an evenly divided vote of the relevant inspectors, the contested voter "may swear in his vote, and there is no necessity of an agreement" (id. at 255 [comment of Moore] [emphasis added]). Subdivision (2) (g), we note, requires the same result. Article II, section 8 was again amended in 1938, but the revisions did not concern canvassing boards such as the one discussed here (see Galie & Bopst at 109 ["The 1938 additions involved changing 'distributing ballots at the polls' to 'distributing ballots to voters' "]; Journal of 1938 NY Constitutional Convention, Appendix 3, Doc No. 16 at 9-10 [Constitution of the State of New York as revised, with amendments passed by the Constitutional Convention and marginal notes indicating the source and changes]).
None of the cases plaintiffs rely on contradict our reading of section 8. In People ex rel. Chadbourne v Voorhis, we explained that the provision "is well understood. It is to guarantee equality of representation to the two majority political parties on all such boards and nothing more" (236 NY 437, 446 [1923] [emphasis added]). We emphasized that the Legislature has authority to "adopt a reasonable method of ascertaining a qualifying fact" concerning voting (id.), and that is what subdivision (2) (g) does here with respect to a signature match. In People ex rel. Stapleton v Bell, we held that a statutory equal representation mandate similar to the constitutional provision at issue here did not allow one party's members of a local board of elections to decline to certify an election based on speculation that certain voters were ineligible (119 NY 175, 179 [1889]). And in Matter of Graziano v County of Albany, we considered only whether a single commissioner had standing to challenge county actions that allegedly impaired the equal representation mandate, without addressing the scope of the provision (3 NY3d 475, 480-481 [2004]).
The dissenting Appellate Division Justices pointed to another line of cases as indicating that, under common law and parliamentary law, there can be no authority to act on a divided vote (see 2024 NY Slip Op 04295, *10 [Egan Jr., J., dissenting], quoting Matter of Felice v Swezey, 278 App Div 958, 959 [2d Dept 1951], and citing People ex rel. Argus Co. v Bresler, 171 NY 302, 309 [1902]). That may be true. However, in enacting Election Law § 9-209 (2) (g), the Legislature expressly declared what happens in the case of a deadlocked board: the ballot is "prepare[d] . . . to be cast and canvassed" pursuant to subdivision (2) (Election Law § 9-209 [2] [g]). Neither of the cases cited by the dissent presented a similar directive. Just the opposite; there was no underlying legislation in either case prescribing a rule of decision in the event of a tie vote (see Argus, 171 NY at 308-309; Felice, 278 App Div at 958-959).
Plaintiffs also assert that the interplay between subdivision (2) (g)'s presumption of validity and subdivision (8) (e)'s limitation on a court's power to declare a ballot uncounted once counted violates constitutional principles of separation of powers and judicial review. The Constitution vests Supreme Court with "general original jurisdiction in law and equity" (NY Const, art VI, § 7). It simultaneously vests the Legislature with the power "to adopt concerning [the right to vote] any reasonable, uniform and just regulations which are in harmony with constitutional provisions" (Matter of Burr v Voorhis, 229 NY 382, 388 [1920]). Here, the statute comports with the Constitution and contains multiple pathways for judicial review. Election Law § 16-106 (5) allows any candidate to seek a temporary or preliminary injunction to halt a canvass, provided that the candidate prove by clear and convincing evidence that "procedural irregularities or other facts arising during the election" warrant such remedy. Executive Law § 63-b (1) empowers the Attorney General to initiate a quo warranto action to contest a candidate's title to office. And a wide variety of criminal prohibitions in the Election Law punish malfeasance and fraud (see e.g. Election Law §§ 17-102, 17-104, 17-108, 17-130, 17-132). In the face of these many levers of judicial supervision, among others, it is inaccurate—and misleading—to say that Election Law § 9-209 dispenses with the role of the judiciary in ensuring that the people enjoy free and fair elections.
Finally, plaintiffs suggest that subdivision (2) (g) might enable electoral fraud by preventing a sole member of the Board from setting aside a ballot so that its validity may be contested in court. As the Appellate Division recognized, the statutory scheme includes numerous safeguards through which the courts can address and prevent electoral fraud as necessary (see 2024 NY Slip Op 04295, *2-3). In addition to the various avenues for judicial [*5]review we have noted, Election Law § 9-209 (5) allows observers to be present for the entirety of the review process, whereby candidates and parties may gather evidence of fraud, in the rare instance that it may occur. To the extent plaintiffs raise concerns about fraudulent voter registrations or ballot applications, the challenged law is largely inapposite: lists of registered voters are regularly made available for public review (see Election Law §§ 5-602, 5-604), and Election Law §§ 5-218 and 5-220 allow claims to contest pending registrations or cancel completed registrations.
Because plaintiffs failed to meet their "heavy burden" of proving Election Law § 9-209 (2) (g)'s unconstitutionality (Foley, 94 NY2d at 677), we hold that the statute does not violate the constitutional principles of separation of powers or of judicial review.
III.

We dismiss the appeal as to the Minority Leaders of the Senate and Assembly as they are not aggrieved by the Appellate Division's order. The Minority Leaders filed submissions at Supreme Court and the Appellate Division setting forth legal arguments consistent with certain of plaintiffs' claims for relief, but neither sought affirmative relief in a pleading nor moved for relief at Supreme Court. In these circumstances, the Appellate Division order did not deny them any relief, nor did it grant any relief adverse to them. They therefore are not aggrieved under CPLR 5511 (see Byrnes v Senate of the State of N.Y., 41 NY3d 1022 [2024]).
Accordingly, on the appeal by plaintiffs Rich Amedure, et al., the order of the Appellate Division should be affirmed, without costs. The appeal, insofar as taken by defendants Minority Leader of the Senate et al., should be dismissed, without costs, upon the ground that they are not parties aggrieved (CPLR 5511).
On appeal by plaintiffs Rich Amedure, et al., order affirmed, without costs. Appeal, insofar as taken by defendants Minority Leader of the Senate of the State of New York et al., dismissed, without costs, upon the ground that they are not parties aggrieved (CPLR 5511). Opinion Per Curiam. Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro, Troutman and Halligan concur.
Decided October 31, 2024

Footnotes

Footnote 1: We need not resolve the parties' disagreement about the extent to which subdivision (2) (g) applies to certain other defects—including extrinsic marks on the ballot itself and unsealed or torn ballots—to decide this appeal.